# EXHIBIT A

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

# Report to the Congress on Further Restrictions on Unsolicited Written Offers of Credit and Insurance

December 2004

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

# Report to the Congress on Further Restrictions on Unsolicited Written Offers of Credit and Insurance

Submitted to the Congress pursuant to section 213(e) of the Fair and Accurate Credit Transactions Act of 2003

December 2004

# Contents

**Executive Summary and Overview** ........ 1
Requirements of the Study and Report ........ 1
Study Approach ........ 2
Findings and Conclusions ........ 3
Availability and Use of Opt-Out Provisions ........ 4
The Benefits and Costs of Receiving Written Offers ........ 5
Potential Effects of Further Restrictions on Prescreened Solicitations ........ 6

**Background** ........ 7
How Prescreening Works ........ 7
Types of Creditors and Insurers That Use Prescreening ........ 8
Why Many Creditors and Insurers Use Prescreening ........ 10

**Opting Out: Mechanisms to Avoid Receiving Unsolicited Written Offers of Credit or Insurance** ........ 11
The FCRA Statutory Mechanism ........ 11
Voluntary Mechanisms ........ 13

**Extent to Which Consumers Use the Available Mechanisms to Avoid Receiving Written Offers** ........ 15
Opting Out ........ 17
Who Chooses to Opt Out, and Why ........ 17
Credit Characteristics of Those Who Opt Out ........ 23
Number of Credit Accounts ........ 23
Credit Limits on Revolving Accounts ........ 23
Total Balances and Utilization Rate on Revolving Accounts ........ 24
Number of Mortgage Accounts ........ 24
Credit Score ........ 24
Number of Collection Items and Public Records ........ 26
Number of Recent Inquiries about Credit or Insurance ........ 26
Locational Characteristics of Those Who Opt Out ........ 27

**Benefits of Receiving Written Offers of Credit or Insurance** ........ 28
Greater Availability of Targeted Pricing and Product Information ........ 28
Prescreening and Shopping ........ 29
Consumer Experience with Prescreened Solicitations ........ 30
Competition ........ 34
Consumers Benefit from Cost Savings of Creditors and Insurers ........ 36

**Costs of Receiving Written Offers of Credit or Insurance** ........ **37**
Inconvenience ........ 37
The Potential for Identity Theft ........ 39
Definition of Identity Theft ........ 39
Prescreening and Identity Theft ........ 41
Privacy Implications ........ 43
Debt Burden ........ 44

**Potential Effects of Further Restrictions on Written Offers of Credit or Insurance** ........ **47**

**Appendix A: Section 213(e) of the Fair and Accurate Credit Transactions Act of 2003** ........ **49**

**Appendix B: Age and Census Tract Characteristics of Individuals in the Credit Record Sample** ........ **50**
Age ........ 50
Urban, Suburban, or Rural Residence ........ 50
Relative Income of Census Tract ........ 50
Racial or Ethnic Composition of Census Tract ........ 52

# Executive Summary and Overview

Each year American consumers receive several billion written offers of credit or insurance they did not request. In many cases, the senders have prescreened the recipients for creditworthiness and suitability using consumer credit records in the files of consumer reporting agencies (CRAs).[1] Such prescreened solicitations are now among the principal techniques creditors and insurers use to inform prospective customers of the availability of their products and to establish new or additional business relationships with them.

The Fair Credit Reporting Act (FCRA) permits creditors and insurers to use CRA information as a basis for sending unsolicited firm offers of credit or insurance, also known as prescreened solicitations, to consumers who meet certain criteria, but only within limits specified in the act. The FCRA also provides a mechanism by which consumers can elect not to receive such solicitations by directing CRAs to exclude their names and addresses from lists provided by these agencies for sending prescreened solicitations. Consumers who choose to have their names removed from lists used for prescreened solicitations may well still receive offers of credit or insurance by mail or telephone, but such offers will not be based on the credit records maintained by the CRAs.

## Requirements of the Study and Report

To learn more about unsolicited written offers of credit and insurance, the Congress directed the Board of Governors of the Federal Reserve System, in section 213(e) of the Fair and Accurate Credit Transactions Act of 2003 (Fact Act), to conduct a study of prescreened solicitations and to summarize the results of the study in a report to the Congress. The Fact Act specifically requires the Board to study the ability of consumers to avoid (or "opt out" of) receiving written offers of credit or insurance in connection with transactions not initiated by the consumer and the potential effect on consumers of any further restrictions on providing them with such written offers of credit or insurance. In particular, the Congress directed the Board to address the following five issues in the study and report:

1. the availability to consumers of opt-out mechanisms
2. the extent to which consumers use existing opt-out mechanisms
3. the benefits to consumers of receiving written offers
4. the costs to or adverse affects on consumers of receiving written offers

---

[1] The three national consumer reporting agencies are Equifax (http://www.equifax.com), Experian (http://www.experian.com), and TransUnion Corporation (http://www.transunion.com).

5. the potential effect on the following factors if further restrictions are imposed on the ability of creditors and insurers to make written offers:
   - o the cost consumers pay to obtain credit or insurance
   - o the availability of credit or insurance
   - o consumers' knowledge about new or alternative products and services
   - o the ability of lenders or insurers to compete with one another
   - o the ability to offer credit or insurance products to consumers who have been traditionally underserved

(See appendix A of this report for the text of section 213(e)). This report responds to the congressional request.

## STUDY APPROACH

In conducting the required study, the Board undertook three tasks, the results of which are summarized in this report. First, to examine the ability of consumers to avoid (or "opt out" of) receiving unsolicited offers of credit or insurance, the Board obtained from one of the three national CRAs the credit records of a large, nationally representative random sample of individuals (excluding identifying personal or creditor information). The sample was obtained for two reasons: (1) to examine what it revealed about the extent to which consumers have exercised their statutory rights to opt out, that is, decline to receive prescreened solicitations and (2) to determine the credit use and other characteristics of consumers who had or had not opted out.

Second, to learn about the views of consumers concerning their experiences with mailed prescreened solicitations, the Board sponsored a May 2004 nationwide survey of consumers on this issue through the University of Michigan's Surveys of Consumers program. This survey covered consumers' behavior with respect to such solicitations when received, their attitudes toward such offers, their knowledge about the contents of such solicitations, and their knowledge about their right not to receive such solicitations.

Third, to obtain the views of creditors, insurers, and other interested or concerned parties, the Board requested public comments on these issues through a notice in the *Federal Register* that creditors, insurers, and others could further publicize through the trade press, consumer newsletters, and other sources.[2] This request specifically asked for comments on the following topics:

- the extent to which insurance providers send prescreened solicitations to consumers

[2] Board of Governors of the Federal Reserve System (2004), "Request for Information for Study on Prescreened Solicitations or Firm Offers of Credit or Insurance" (Docket No. OP-1195), *Federal Register*, vol. 69 (May 24), pp. 29539-40.

- the availability of statutory or voluntary mechanisms available to consumers to notify creditors and insurance providers that a consumer does not wish to receive prescreened solicitations
- the extent to which consumers are currently using existing statutory and voluntary mechanisms to avoid receiving prescreened solicitations
- the benefits of receiving prescreened solicitations
- significant costs or adverse effects, if any, that consumers incur as a result of receiving prescreened solicitations (especially specific comments on fraud-related losses due to identity theft)
- additional restrictions, if any, that should be imposed on consumer reporting agencies, lenders, or insurers to restrict the ability of lenders and insurers to provide prescreened solicitations to consumers. More specifically,
  - how the additional restrictions would benefit consumers
  - how the additional restrictions would affect the cost consumers pay to obtain credit or insurance, the availability of credit or insurance, knowledge about new or alternative products and services, the ability of creditors or insurers to compete with one another, and the ability of creditors or insurers to offer credit or insurance to consumers who have been traditionally underserved

## FINDINGS AND CONCLUSIONS

Prescreened offers can be useful to both their senders and recipients. Many companies that solicit new credit accounts and insurance policies have found prescreening to be a cost-effective way to identify individuals who are likely prospects for the products they offer and to control certain risks related to offering these products. Because it can be expensive to solicit and establish new business relationships with consumers, firms that solicit new credit accounts and insurance policies are interested in identifying likely prospects for the services they offer; hence, the interest in prescreening. Firms weigh the costs of prescreening against the expected profitability of additional business developed through this marketing channel. If they find that the net benefits are likely to be positive, they may engage in prescreened marketing as one way to generate new business.

For consumers, prescreened solicitations reduce search costs by providing them with ready information about product availability and pricing tailored more closely to their financial experiences and needs. Such screening also increases the likelihood that consumers responding to such solicitations qualify for the product or service being offered and thereby reduces the possibility that the consumer will be wasting his or her time and effort when responding to a mailing. Because of their advantages to senders and consumers, prescreened solicitations are important in promoting competition and enhancing consumer welfare in the markets for credit and insurance.

Nonetheless, some observers have raised concerns that sometimes such solicitations might lead to difficulties for some consumers. In addition to the simple inconvenience of

receiving unwanted "junk mail," these observers note that prescreened solicitations can become lost or stolen and potentially lead to fraudulent activity that may impair a consumer's credit rating or result in out-of-pocket losses. Some also believe that individuals' rights to privacy are compromised when creditors or insurers use CRA records to contact them through prescreened solicitations. Finally, some observers are concerned that the large volume of credit offers made through prescreened solicitations might encourage some consumers to take on more debt than they can reasonably handle.

This report has not found that prescreened solicitations have a significant bearing on the extent of these problems, and, therefore, finds that further restrictions on prescreened solicitations are not likely to alleviate such problems. Moreover, any substantive restrictions would be likely to significantly reduce the beneficial effects of prescreened solicitations on competition and consumer access to credit and insurance. These findings and conclusions are covered in more detail below.

## Availability and Use of Opt-Out Provisions

Consumers who prefer not to receive prescreened written offers of credit or insurance are able to act on this preference through a process of "opting out." The most important means of opting out is by using the statutory mechanism contained in section 604 of the Fair Credit Reporting Act (FCRA), which governs the use of prescreening techniques. Section 604 specifically establishes a set of rules that regulate how creditors and insurers may use CRA records as the basis for sending unsolicited firm offers of credit or insurance to consumers. It also prescribes a mechanism by which consumers can elect not to receive these prescreened solicitations by opting out. Section 604 further requires creditors and insurers using prescreening to notify consumers of this opt-out right in each prescreened solicitation they send.

Beyond the statutory provision for opting out, voluntary mechanisms established by industry groups and individual companies permit consumers to eliminate their names from listings used for prescreened written offers of credit or insurance. These voluntary mechanisms are important in the marketplace, accounting for an estimated one-third of the individuals on the opt-out lists maintained by the national CRAs.

Currently, about 6 percent of consumers with credit records have opted out of receiving prescreened written offers of credit or insurance. The large number of individuals who have opted out suggests that it is not especially difficult to do so if individuals are aware of this option. A consumer survey indicates that about one-fifth of consumers are aware of their right under federal law not to receive prescreened solicitations. If awareness of this right was more widespread, it is likely that more consumers would opt out.

Analysis of CRA records indicates that consumers with more credit accounts are more likely to opt out than those with fewer accounts. The higher opt-out rate for those with a relatively large number of credit relationships may indicate that such individuals (1) are

not looking for further credit or (2) are more familiar with the opt-out process or both. Such individuals may be more familiar with the opt-out process because they have received more prescreened solicitations and, therefore, have had more opportunities to read the opt-out notice included in such solicitations.

## The Benefits and Costs of Receiving Written Offers

The benefits to consumers of receiving prescreened written offers of credit or insurance are significant. Prescreened offers help consumers more quickly identify those credit and insurance products for which they likely qualify. (Because prescreened offers must be "firm offers" of credit or insurance, a consumer generally will receive prescreened solicitations for only those products for which he or she likely qualifies.) These prescreened offers also contain pricing and product information, often in a form easily comparable to accounts currently held.

Consumer survey data analyzed by the Board indicate that consumers seem generally familiar with the type of content in written prescreened solicitations, even if they do not always open, read, or study each offer. When consumers do review the prescreened solicitations, they are most interested in the pricing information. The widespread availability of such pricing and product information contained in prescreened offers helps to make markets for these products more competitive, an advantage that benefits all consumers.

The ability of creditors and insurers to tailor offers of credit or insurance to consumers' pricing and product preferences at relatively low cost enhances competition and marketing efficiency. Also, by having access to credit record information for the purposes of prescreening, creditors and insurers are better able to control certain risks related to offering these products.

In a competitive market, cost savings for creditors and insurers translate into lower prices and wider credit and insurance availability for consumers, possibly benefiting those consumers who have traditionally been underserved. Additionally, because prescreened solicitations are widely used and must be "firm" offers of credit, consumers gain better awareness of available credit products and rates.

Written prescreened solicitations for credit and insurance carry some potential costs, including the inconvenience of receiving unwanted mail, the possibility of identity theft, the possible loss of privacy, and the potential for additional debt burden. Although these issues are important considerations, it does not appear that restricting written offers of credit or insurance would mitigate these problems, and the alternatives to prescreening may even exacerbate some of them. For example, restricting the ability of creditors and insurers to send prescreened solicitations to qualified applicants could result in the receipt of more unsolicited and unwanted mail by consumers as companies are forced to use less-efficient mechanisms to acquire customers.

## Potential Effects of Further Restrictions on Prescreened Solicitations

Written offers of credit and insurance sent directly to consumers, often resulting from prescreened solicitation lists using credit records in the files of CRAs, have the potential to increase competition in the market for the relevant consumer financial services. The primary benefits of competition consist of lower prices and an increased availability of the product or service in question. As a result, it is reasonable to conclude that actions undertaken to restrict the ability of lenders and insurers to provide written offers of credit or insurance to consumers would on balance result in a less competitive marketplace and thus relatively higher prices and reduced availability.

Also, it is difficult to see how further restrictions on the ability of lenders and insurers to provide written offers of credit or insurance to consumers would improve the condition of those individuals or groups of individuals who might have been underserved in the past. It also is difficult to see how reducing the amounts of direct, tailored information sent to consumers on the availability and pricing of financial services would improve their "knowledge about new or alternative products and services."

The Fact Act includes enhancements to the opt-out-notice provisions of the FCRA; these include a review of the presentation and placement of the notice in prescreened solicitations and an extension of the opt-out period from two years to five years. The Congress also directed the Federal Trade Commission (FTC) to conduct a campaign to raise public awareness of opt-out rights, which may have the effect of increasing the frequency of opting out. These developments suggest that further legislative or regulatory changes to the opt-out system should await evaluation of the effects of these new provisions.

# Background

Creditors and insurers use a variety of methods to establish account relationships with consumers. The most common methods used by creditors offering general-purpose credit cards (such as Discover, MasterCard, Optima, or Visa), for example, are direct mail (prescreened or not); outbound telephone calls (prescreened or not); television, print, and Internet advertisements; electronic mail; promotional events; and "take one" brochures. Creditors also use direct mail and a variety of other print and electronic media to solicit customers for other credit products.[3]

Insurance companies market their products and services in different ways depending on their business model. Some rely on a network of independent insurance agents or their own agents to identify and acquire customers. Some also use direct marketing approaches, including prescreened solicitations.

## How Prescreening Works

In prescreening, a creditor or insurer establishes a set of specific credit criteria (such as a minimum credit score) and requests from a CRA the names, addresses, and certain other information on consumers in the CRA's database who meet the specified criteria.[4] Alternatively, the creditor or insurer may provide a list of potential customers to the CRA and request that the CRA identify which consumers on that list meet the established credit criteria. Prescreening requests to CRAs may be made either directly by the creditors and insurers or indirectly through a third-party vendor. Prescreened solicitations may be conducted by mail, telephone, or electronically through the Internet, with use of the U.S. mail being the most common approach.[5]

---

[3] Although creditors use credit files at CRAs to prescreen solicitations for a variety of credit products, prescreening is most common in soliciting credit card accounts. For this reason, most available information about prescreening, and much of the discussion in this report, pertains to credit card accounts.

[4] Generically, a "credit score" is a statistically derived measure of creditworthiness that ranks individuals according to their default or credit risk, typically on the basis of information in their credit reports. As such, a credit score measures the relative degree of credit risk a borrower represents to a creditor. Credit scores are typically associated with an odds ratio that represents the proportion of individuals at that credit-score level who are likely to become delinquent on their credit obligation. "Insurance scores" also are derived from information in consumer reports, but such scores use insurance claims experience. In this report, the term "credit score" refers to both kinds of scores.

[5] As required, this report addresses only written prescreened solicitations. For purposes of completeness, however, the report contains some data on prescreened solicitations made by telephone.

## TYPES OF CREDITORS AND INSURERS THAT USE PRESCREENING

Prescreened solicitations are used to establish credit relationships for a wide variety of products including credit cards, home equity lines of credit, "live check" loans, student loans, and automobile credit.[6] Perhaps the most frequent use of prescreening is in the area of credit cards.

Industry sources indicate that nearly 70 percent of general-purpose credit card accounts established in 2002 resulted from direct mail contact, prescreened or not (table 1). Such mailings have grown substantially over the past decade, to about 5 billion in 2001 and 2002, a level nearly five times that of a decade earlier (figure 1). About 75 percent of the credit card accounts established through direct mailing (53 percent of all new accounts)

Table 1. Distribution of new credit card accounts, by method of acquisition, 2002

| Method | Percent |
|---|---|
| Direct mail | |
| Prescreened | 53 |
| Not prescreened | 17 |
| Phone call by creditor (prescreened) | 8 |
| Phone call by customer | 7 |
| Internet banner | 3 |
| E-mail | 2 |
| Event | 1 |
| "Take-one" brochure | 1 |
| Other | 8 |
| Total | 100 |

Note. Here and in the following tables, components may not sum to totals because of rounding.

Source. Information Policy Institute (2003), *The Fair Credit Reporting Act: Access, Efficiency & Opportunity: The Economic Importance of Fair Credit Reauthorization* (Washington: National Chamber Foundation for the IPI, June), p. 57, table 13, www.infopolicy.org/pdf/fcra_report.pdf.

[6] A prescreened mail solicitation for a live-check loan is sent in the form of a check made out to the consumer for an exact amount. The terms of the offer specify that by endorsing and depositing the check, the consumer has agreed to a loan from the company for the amount of the check.

Figure 1. Mail volume and response rate for U.S. credit card solicitations, 1990-2003




Source. "Mail Monitor," Synovate, Inc., at http://core.synovate.com/MAILVOL.asp, accessed September 9, 2004.

were the consequence of a prescreened solicitation (table 1).[7] Prescreened telephone contacts accounted for about 15 percent of the new accounts. Prescreened solicitations, both through the mail and by telephone, accounted for more than two-thirds of all new credit card accounts established in 2002.[8]

Use of prescreening by insurance companies is more limited, in large part because so much of their acquisition of new accounts is through independent agents who are responsible for marketing. A public comment by one national CRA indicated that it had used its files for prescreening on behalf of forty-two insurance companies in 2003. This is a much smaller number than the number of creditors employing prescreening using CRA files. The number of companies in the latter group is not known precisely, but it is at least in the hundreds.

[7] Information Policy Institute (2003), *The Fair Credit Reporting Act: Access, Efficiency & Opportunity: The Economic Importance of Fair Credit Reauthorization* (Washington: National Chamber Foundation for the IPI), June, p. 57, table 13, www.infopolicy.org/pdf/fcra_report.pdf.

[8] Information Policy Institute, *The Fair Credit Reporting Act.*

## WHY MANY CREDITORS AND INSURERS USE PRESCREENING

Many companies have found that prescreening improves marketing efficiency. Companies using prescreening have found that it facilitates the solicitation process by limiting solicitations to those consumers who satisfy the established credit criteria, reducing account acquisition costs for creditors and insurers. For example, prescreening allows many creditors and insurers to avoid the cost of sending solicitations to large numbers of consumers who ultimately would not qualify for the credit or insurance products being offered. Likewise, prescreening allows many creditors and insurers to reduce the number of responses that they must reject and the related costs of providing required rejection letters and dealing with those who may be dissatisfied.

Also, creditors and insurers have found that by having access to credit record information at the prescreening phase, they are better able to control certain risks relating to the offering of their products. For example, by prescreening, a creditor or insurer can use the information in a credit file twice, once to select prospective customers, and a second time, if the prospect replies, to verify that no substantive change has occurred in the individual's credit status. Having information about the consumer at two points in time increases the predictability of risk involving that consumer.

As discussed below, in a competitive market, these market efficiencies and better control of risks result in lower prices, more product choices, and wider credit and insurance availability to consumers, including those traditionally underserved. Consumers further benefit by the receipt of fewer solicitations that do not match their credit or insurance circumstances.

# Opting Out: Mechanisms to Avoid Receiving Unsolicited Written Offers of Credit or Insurance

The first issue that the present study is to address under section 213(e)(3) of the Fact Act is "the current statutory or voluntary mechanisms that are available to a consumer to notify lenders and insurance providers that the consumer does not wish to receive written offers of credit or insurance."

## THE FCRA STATUTORY MECHANISM

Section 604 of the Fair Credit Reporting Act specifically establishes a set of rules that regulate how creditors and insurers may use CRA records as the basis for sending unsolicited firm offers of credit or insurance to consumers. It also prescribes a mechanism by which consumers can elect not to receive these prescreened solicitations.

Section 604(c) designates the conditions for "furnishing reports in connection with credit or insurance transactions that are not initiated by the consumer," in other words, for prescreened offers of credit or insurance based on information in the individual's credit record. Specifically, section 604(c) mandates that a CRA may provide information on a consumer for prescreening only if (1) the consumer authorizes the CRA to provide the information (not usually a component of prescreened offers of credit or insurance) or (2) "the transaction consists of a firm offer of credit or insurance," the CRA has established the required procedures allowing consumers to exclude themselves from the prescreened lists, and the consumer has not done so. A "firm offer of credit or insurance" is defined as any offer of credit or insurance to a consumer that will be honored if, on the basis of information in the consumer's credit record, the consumer meets the specific criteria used to select him or her for the offer, except that the offer may be further conditioned in certain circumstances.[9]

This provision establishes an important first requirement, namely that prescreening must be employed solely for offering credit or insurance, not merely for advertising. Furthermore, a person receiving a prescreened list from a CRA may receive only limited information about each consumer: (1) the name and address of the consumer, (2) an identifier that is not unique to the consumer and that is used by the person solely for the purpose of verifying the identity of the consumer (such as a partial social security number), and (3) other information about the consumer that does not identify the relationship or experience of the consumer with a particular creditor or other entity. In addition, the law requires that CRAs must comply with the provisions concerning

---

[9] These circumstances include verification of the specific criteria (for example, verification of income and employment) used to select the consumer for the offer and the consumer's willingness to supply any needed collateral disclosed in the offer. These circumstances are outlined in section 603(l) of the FCRA.

consumers' options to have their names removed from prescreened lists; this option is called the right to "opt out."

The statute also details the required procedures concerning consumers' opt-out rights. It specifies the ways that consumers may notify CRAs of their intention to opt out, the agencies' required responses to opt-out notices received from consumers, necessary timing for acting on opt-out notices from consumers, the duration of opt-out notices from consumers, and necessary components of the notification system itself (for example, toll-free telephone availability). Equally important are the requirements that the existence of the system be disclosed to consumers, but these mandates are found later, in section 615 of the law.

A consumer may notify the agency through a system maintained by the agency (which, as indicated, must include a toll-free telephone number) or by submitting a signed "notice of election" form issued by the agency. Under provisions of the FCRA that go into effect on December 1, 2004, requests made through the telephone notification system maintained by the agency expire five years after notification unless the consumer revokes the election.[10] Requests made through a signed notice-of-election form never expire, although they may be revoked by the consumer. When a consumer contacts an agency through the notification system, the agency must inform the consumer that the election is effective for only five years if the consumer does not submit to the agency a signed notice-of-election form issued by the agency. The agency also must provide to the consumer a notice-of-election form upon request of the consumer.[11]

Section 615(d) of the FCRA specifies the details of the required notice to consumers regarding their right to opt out of receiving prescreened solicitations. Conversations with officials of the CRAs indicate that their companies monitor compliance by clients who use their credit files for prescreening activities.

Under the FCRA, any person who uses a consumer report in connection with a prescreened solicitation must, with each written prescreened solicitation, provide to the consumer, a clear and conspicuous statement that (1) information contained in the consumer report was used in connection with the offer; (2) the consumer received the offer because he or she satisfied the criteria for creditworthiness or insurability used to screen for the offer; (3) if applicable, the credit or insurance may not be extended if, after the consumer responds, it is determined that the consumer does not meet the criteria used

---

[10] Requests made through the telephone notification system before December 1, 2004, expire two years after notification unless the consumer revokes the election.

[11] Although opting out eliminates future solicitations based on credit-record information, consumers may still receive other types of mail solicitations (not prescreened) from creditors and insurers. In addition, consumers may receive advertisements and solicitations (not prescreened) from, for example, local and national merchants, religious and charitable organizations, professional and alumni associations, and political candidates and parties. To avoid mail from these sources, the consumer would need to contact them directly or rely on voluntary, private-sector "do not mail" lists, such as the one maintained by the Direct Marketing Association (discussed in more detail below).

for screening or any applicable criteria bearing on creditworthiness or insurability, or the consumer does not furnish required collateral; and (4) the consumer has the right to prohibit use of information in the consumer's file in connection with future prescreened offers of credit or insurance by contacting the notification system established by the CRA that provided the report. The address and toll-free telephone number of the appropriate notification system also must be provided.

In 2003, section 213 of the Fact Act amended the FCRA concerning disclosures about prescreened solicitations. Section 213(a)(2)(B) amends the FCRA to require that the notice provided by creditors or insurers with each written unsolicited prescreened offer "be presented in such format and in such type size and manner as to be simple and easy to understand, as established by the [FTC], by rule, in consultation with the federal banking agencies and the National Credit Union Administration." These rules are to be in place by December 4, 2004. Beginning December 1, 2004, section 213(c) of the Fact Act extends from two years to five years the effective period of a consumer's election not to receive prescreened solicitations through a telephone notification system described above.

## VOLUNTARY MECHANISMS

The private sector has created voluntary mechanisms for consumers to avoid receiving prescreened solicitations in the mail with the goal of satisfying the needs both of consumers and of participating companies. Most notably, the Direct Marketing Association (DMA) maintains an opt-out list of consumers who have indicated they do not wish to receive advertising mail at home.[12] The DMA's Mail Preference Service (MPS) allows individuals to opt out of national mailing lists used by companies to identify individuals to whom they may send marketing materials. Consumers can participate in the system to avoid the receipt of unwanted prescreened solicitations, and companies participate to cut marketing expenses and to avoid upsetting consumers who have made it known that they do not want to receive prescreened solicitations in the mail.

All companies that are members of the DMA are required to use the MPS. Members run their list of prospective customers against the MPS "do not mail" file to remove these individuals from any mailing. The MPS also is made available to nonmembers of the DMA, so that these marketers may also take advantage of the service. The DMA updates its do-not-mail list monthly, and it is distributed four times per year. The individual's name is maintained on the list for a period of five years. To create a comprehensive opt-out list, the CRAs add the individuals on the DMA's do-not-mail list to those who have opted out directly with the CRAs.

[12] The DMA is the largest national trade association for the direct marketing industry. For more information about its do-not-mail list, see www.dmaconsumers.org/offmailinglist.html.

In addition to the joint opt-out lists established either by law or voluntarily through industry effort, many companies have opt-out programs of their own. About one-third of industry respondents to the Board's request for comments on the present study specifically mentioned that they maintained an internal list of their own customers who specifically requested not to receive further prescreened solicitations. These companies indicated that relatively few customers had directly requested that they not receive further solicitations.

## Extent to Which Consumers Use the Available Mechanisms to Avoid Receiving Written Offers

The second issue that section 213(e)(3) of the Fact Act asks the Board to address is "the extent to which consumers are currently utilizing existing statutory and voluntary mechanisms to avoid receiving offers of credit or insurance."

Little information has been available regarding the frequency at which consumers opt out of receiving prescreened solicitations for credit and insurance products using provisions in section 604 of the FCRA. Likewise, little information has been available about the credit or other characteristics of consumers who have placed their names on the opt-out list. To learn more about consumers' use of consumer credit generally as well as their use of the opt-out provision provided by the FCRA, the Board engaged one of the three national CRAs to supply the credit records of a large, nationally representative sample of individuals as of June 30, 2003. The credit record data include all information found in the credit files of the approximately 300,000 individuals in the sample except that they exclude all identifying information about the individuals and the creditors.

The sample data do not contain any addresses of individuals but do include the state, county, and census tract location of their residence. This information allows comparisons with the 2000 decennial census information on census tract population characteristics (such as income and geographic distribution, including urban, suburban, and rural delineations) and other regional and state classifications.

Each credit record in the Board sample contains as many as 350 distinct items describing the consumer's past and ongoing experiences with credit, collection-agency actions, and various types of so-called "public records," which consist of bankruptcies, foreclosures, tax liens (local, state, or federal), garnishments, and other civil judgments. Many thousands of creditors and other entities reported information contained in the credit records, including more than 92,000 reporters overall and 23,600 currently providing credit-related data at the time of the sample.[13] In the aggregate, the sample contains information on about 3.7 million credit accounts, more than 318,000 collection-related actions, approximately 65,000 public record actions, and about 913,000 creditor inquiries. The credit record of each individual did not necessarily contain each kind of information (table 2).

The sample data also contains credit scores for about 250,000 individuals (about 83 percent of the sample), each constructed using the CRA's proprietary credit-risk-scoring

---

[13] The latter figure is the number of reporters providing information to the CRA within three months of the time the sample was drawn.

Table 2. Individuals with credit records, by type of information in the records, June 30, 2003

| Type of information | Number of individuals | Percent |
|---|---|---|
| **Any** | **301,536** | **100** |
| Credit account | | |
| At least one | 259,211 | 86.0 |
| No other type | 63,501 | 21.1 |
| One other type | | |
| Collection agency account | 67,747 | 22.5 |
| Public record | 34,715 | 11.5 |
| Creditor inquiry | 182,553 | 60.5 |
| Collection agency account | | |
| At least one | 109,964 | 36.5 |
| No other type | 34,978 | 11.6 |
| Public record | | |
| At least one | 36,742 | 12.2 |
| No other type | 53 | * |
| Creditor inquiry | | |
| At least one | 188,616 | 62.6 |
| No other type | 31 | * |
| Other | 15 | * |

Note. Sample is a nationally representative selection of 301,536 individuals with credit records in the database of a consumer reporting agency as of June 30, 2003.

1. Made within two years of June 30, 2003, the date the sample was drawn.

* Less than 0.5 percent.

model as of the date the sample was drawn.[14] To facilitate the analysis here, the scores received from the CRA were aligned statistically to match the distribution of the more familiar FICO score, named for its developer (Fair, Isaac, and Company); information on the distribution of FICO scores across the population is readily available.[15] About 17 percent of individuals in the sample were not assigned a credit score by the CRA; the vast majority of these individuals either did not have any credit accounts or had credit accounts so recently established that the payment history was too new to judge.

At the request of the Board, the CRA placed an indicator in the record of each individual in the sample who had asked by March 2004 to have his or her name placed in the opt-out

[14] The credit score is not part of the credit record of an individual. Rather, upon request by a user of the data, such as a prospective creditor or insurer, the CRA calculates the score on the basis of information in the credit record.

[15] See www.myfico.com/myfico/CreditCentral/ScoringWorks.asp.

list maintained by the CRA that supplied the credit records (this list includes requests received by the CRA as well as names received from the DMA's do-not-mail list). Combined, the credit record files and the opt-out indicator provide the information necessary to measure the extent to which individuals have chosen to opt out and to profile the credit and selected individual or neighborhood demographic or locational characteristics of such individuals.

## OPTING OUT

The nationally representative sample indicates that, as of March 2004, about 6 percent of all individuals in the country with credit records had chosen to place their names on the opt-out list maintained by the national CRAs (table 3). This large number of individuals suggests that it is not difficult for individuals to opt out of receiving solicitations.[16]

The opt-out percentage includes individuals with a credit record but no credit account. Notably, about 12 percent of the individuals in the sample have credit records only because of an item reported by a collection agency, such as unpaid bills for medical or utility services (table 2). In addition, a very small proportion of individuals have a credit record only because of a public-record action, such as a judgment or tax lien, that had been reported to the CRAs. If the sample of credit records is limited solely to the population of credit-using adults (individuals age 21 and older who have an open credit account with a positive balance), the incidence of opting out increases from 6.0 percent to 9.4 percent (data not shown in table 3).

## WHO CHOOSES TO OPT OUT, AND WHY

We compared the credit circumstances of individuals who are on the opt-out list maintained by the CRAs to those who are not by segmenting the sample in various ways. One of the divisions was according to measures of credit (for example, numbers, kinds, balances, and utilization of credit accounts).[17] A second division was by the summary risk measure called a credit score. A third division was by records of serious derogatory information, such as collections activity or public-record actions. The remaining divisions were by the age of the individual, by state and region of the country where the

---

[16] In its public comment on the present study, TransUnion, one of the three national CRAs, reported that it has 18.7 million consumer names and addresses on its opt-out list, of which about 35 percent arise from the DMA do-not-mail list. Some individuals may be double counted because they requested that their names be placed on both the DMA and CRA opt-out lists.

[17] Credit card accounts include only those reported to the CRA in the twelve-month period preceding the date the survey sample was drawn. The specific sample size differs for each analysis discussed in the text because the use of credit varies widely across the population or because information may not have been available for some individuals.

Table 3. Opt-out choice, by credit characteristic of individuals with credit records and by region and state of residence, June 30, 2003

Percent

| Item | All | Distribution of opt-out choice, by characteristic | | Distribution of characteristic, by opt-out choice | | |
|---|---|---|---|---|---|---|
| | | Opted out | Did not opt out | Opted out | Did not opt out | Total |
| **Any** | **100** | ... | ... | **6.0** | **94.0** | **100** |
| *Number of credit accounts with satisfactory payment record* | | | | | | |
| 0 | 28.1 | 4.6 | 29.7 | 1.0 | 99.0 | 100 |
| 1 | 13.3 | 6.7 | 13.8 | 3.2 | 96.8 | 100 |
| 2–3 | 14.8 | 16.6 | 14.7 | 7.1 | 92.9 | 100 |
| 4–5 | 12.2 | 18.5 | 11.7 | 9.6 | 90.4 | 100 |
| 6 or more | 31.6 | 53.6 | 30.1 | 10.7 | 89.3 | 100 |
| Total | 100 | 100 | 100 | ... | ... | ... |
| *Number of credit card accounts* | | | | | | |
| 0 | 7.6 | 1.1 | 8.1 | 1.1 | 98.9 | 100 |
| 1 | 12.7 | 3.4 | 13.4 | 2.0 | 98.0 | 100 |
| 2–3 | 14.2 | 8.6 | 14.7 | 4.4 | 95.6 | 100 |
| 4–6 | 18.1 | 18.6 | 18.1 | 7.5 | 92.5 | 100 |
| 7 or more | 47.5 | 68.4 | 45.8 | 10.6 | 89.4 | 100 |
| Total | 100 | 100 | 100 | ... | ... | ... |
| *Total credit limit on revolving accounts, by quintile* | | | | | | |
| First | 20 | 8.8 | 21.1 | 3.9 | 96.1 | 100 |
| Second | 20 | 15.0 | 20.5 | 6.6 | 93.4 | 100 |
| Third | 20 | 22.0 | 19.8 | 9.7 | 90.3 | 100 |
| Fourth | 20 | 25.7 | 19.5 | 11.3 | 88.7 | 100 |
| Fifth | 20 | 28.6 | 19.2 | 12.6 | 87.4 | 100 |
| Total | 100 | 100 | 100 | ... | ... | ... |
| *Total balance on revolving accounts, by quintile* | | | | | | |
| First | 20 | 16.5 | 20.4 | 7.7 | 92.3 | 100 |
| Second | 20 | 19.2 | 20.1 | 9.0 | 91.0 | 100 |
| Third | 20 | 20.6 | 20.0 | 9.6 | 90.4 | 100 |
| Fourth | 20 | 20.2 | 20.0 | 9.5 | 90.5 | 100 |
| Fifth | 20 | 23.6 | 19.6 | 11.1 | 89.0 | 100 |
| Total | 100 | 100 | 100 | ... | ... | ... |

Note appears at end of table.

Table 3. —Continued
Percent

| Item | All | Distribution of opt-out choice, by characteristic | | Distribution of characteristic, by opt-out choice | | |
|---|---|---|---|---|---|---|
| | | Opted out | Did not opt out | Opted out | Did not opt out | Total |
| *Utilization rate, by quintile* | | | | | | |
| First | 20 | 14.9 | 20.6 | 6.3 | 93.7 | 100 |
| Second | 20 | 26.3 | 19.4 | 11.2 | 88.8 | 100 |
| Third | 20 | 24.7 | 19.4 | 10.6 | 89.5 | 100 |
| Fourth | 20 | 20.1 | 20.0 | 8.5 | 91.5 | 100 |
| Fifth | 20 | 14.0 | 20.6 | 5.9 | 94.1 | 100 |
| Total | 100 | 100 | 100 | ... | ... | ... |
| *Number of mortgages with satisfactory payment record* | | | | | | |
| 0 | 76.1 | 57.9 | 77.3 | 4.8 | 95.2 | 100 |
| 1 or more | 24.0 | 42.1 | 22.7 | 11.1 | 88.9 | 100 |
| Total | 100 | 100 | 100 | ... | ... | ... |
| *Credit score (range from 500 to 850)* | | | | | | |
| Less than 550 | 6.0 | 2.3 | 6.3 | 2.9 | 97.1 | 100 |
| 550–620 | 11.2 | 5.8 | 11.6 | 3.9 | 96.1 | 100 |
| 621–660 | 9.4 | 4.4 | 9.8 | 3.6 | 96.4 | 100 |
| 661–700 | 13.8 | 10.6 | 14.1 | 5.8 | 94.2 | 100 |
| 701 or more | 59.6 | 76.9 | 58.2 | 9.8 | 90.2 | 100 |
| Total | 100 | 100 | 100 | ... | ... | ... |
| Memo: Credit score | | | | | | |
| Has score | 82.9 | ... | ... | 7.6 | 92.4 | 100 |
| Has no score | 17.1 | ... | ... | .2 | 99.8 | 100 |
| *Number of collection accounts* | | | | | | |
| 0 | 63.5 | 58.0 | 63.9 | 5.8 | 94.2 | 100 |
| 1 or more | 36.5 | 42.0 | 36.1 | 7.3 | 92.7 | 100 |
| Total | 100 | 100 | 100 | ... | ... | ... |
| *Number of public records* | | | | | | |
| 0 | 87.8 | 85.9 | 87.9 | 6.2 | 93.8 | 100 |
| 1 or more | 12.2 | 14.1 | 12.1 | 7.3 | 92.7 | 100 |
| Total | 100 | 100 | 100 | ... | ... | ... |

Table 3. Opt-out choice, by credit characteristic of individuals with credit records and by region and state of residence, June 30, 2003—Continued

Percent

| Item | All | Distribution of opt-out choice, by characteristic | | Distribution of characteristic, by opt-out choice | | |
|---|---|---|---|---|---|---|
| | | Opted out | Did not opt out | Opted out | Did not opt out | Total |
| *Number of credit inquires in past year* | | | | | | |
| 0 | 20.0 | 19.2 | 20.1 | 7.4 | 92.6 | 100 |
| 1 | 27.7 | 26.9 | 27.8 | 7.5 | 92.5 | 100 |
| 2–3 | 28.9 | 29.3 | 28.9 | 7.9 | 92.1 | 100 |
| 4–5 | 12.4 | 13.4 | 12.3 | 8.4 | 91.6 | 100 |
| 6 or more | 11.0 | 11.1 | 10.9 | 7.9 | 92.1 | 100 |
| Total | 100 | 100 | 100 | ... | ... | ... |
| *Region (shown with its subregions)* | | | | | | |
| Northeast (New England; Middle Atlantic) | 18.1 | 18.2 | 18.1 | 6.4 | 93.6 | 100 |
| Midwest (East and West North Central) | 22.4 | 23.2 | 22.3 | 6.6 | 93.4 | 100 |
| South (South Atlantic; East and West South Central) | 36.2 | 32.7 | 36.5 | 5.7 | 94.3 | 100 |
| West (Mountain; Pacific) | 23.3 | 25.9 | 23.1 | 7.0 | 93.0 | 100 |
| Total | 100 | 100 | 100 | ... | ... | ... |
| *Subregion and state* | | | | | | |
| New England | 4.6 | 4.7 | 4.5 | 6.6 | 93.4 | 100 |
| Maine | 9.9 | 7.1 | 10.1 | 4.7 | 95.3 | 100 |
| New Hampshire | 9.5 | 8.2 | 9.6 | 5.7 | 94.3 | 100 |
| Vermont | 4.6 | 4.3 | 4.6 | 6.3 | 93.7 | 100 |
| Massachusetts | 43.0 | 49.1 | 42.6 | 7.5 | 92.5 | 100 |
| Rhode Island | 7.6 | 5.3 | 7.8 | 4.6 | 95.4 | 100 |
| Connecticut | 25.4 | 26.0 | 25.4 | 6.8 | 93.3 | 100 |
| State total | 100 | 100 | 100 | ... | ... | ... |
| Middle Atlantic | 13.5 | 13.5 | 13.5 | 6.3 | 93.7 | 100 |
| New York | 46.0 | 47.7 | 45.9 | 6.5 | 93.5 | 100 |
| New Jersey | 21.9 | 21.0 | 21.9 | 6.1 | 93.9 | 100 |
| Pennsylvania | 32.1 | 31.2 | 32.1 | 6.1 | 93.9 | 100 |
| State total | 100 | 100 | 100 | ... | ... | ... |

Table 3. —Continued
Percent

| Item | All | Distribution of opt-out choice, by characteristic | | Distribution of characteristic, by opt-out choice | | |
|---|---|---|---|---|---|---|
| | | Opted out | Did not opt out | Opted out | Did not opt out | Total |
| East North Central | 16.0 | 14.9 | 16.1 | 5.9 | 94.4 | 100 |
| Ohio | 25.6 | 24.6 | 25.6 | 5.7 | 94.3 | 100 |
| Indiana | 13.8 | 12.3 | 13.9 | 5.3 | 94.7 | 100 |
| Illinois | 27.0 | 28.4 | 26.9 | 6.2 | 93.8 | 100 |
| Michigan | 21.8 | 23.1 | 21.7 | 6.3 | 93.7 | 100 |
| Wisconsin | 11.9 | 11.6 | 11.9 | 5.8 | 94.2 | 100 |
| State total | 100 | 100 | 100 | ... | ... | ... |
| West North Central | 6.4 | 8.3 | 6.3 | 8.2 | 91.8 | 100 |
| Minnesota | 24.9 | 27.5 | 24.7 | 9.1 | 90.9 | 100 |
| Iowa | 14.8 | 11.9 | 15.1 | 6.6 | 93.4 | 100 |
| Missouri | 30.4 | 38.4 | 29.6 | 10.4 | 89.6 | 100 |
| North Dakota | 3.1 | 1.5 | 3.2 | 3.9 | 96.1 | 100 |
| South Dakota | 3.6 | 2.2 | 3.7 | 5.1 | 94.9 | 100 |
| Nebraska | 8.7 | 6.6 | 8.9 | 6.3 | 93.7 | 100 |
| Kansas | 14.6 | 11.9 | 14.8 | 6.7 | 93.3 | 100 |
| State total | 100 | 100 | 100 | ... | ... | ... |
| South Atlantic | 19.2 | 19.3 | 19.2 | 6.4 | 93.7 | 100 |
| Delaware | 1.6 | 1.4 | 1.6 | 5.9 | 94.1 | 100 |
| District of Columbia | 1.1 | 1.4 | 1.1 | 7.7 | 92.3 | 100 |
| Maryland | 10.0 | 14.5 | 9.7 | 9.2 | 90.8 | 100 |
| Virginia | 13.0 | 14.0 | 13.0 | 6.8 | 93.2 | 100 |
| West Virginia | 3.2 | 1.4 | 3.4 | 2.7 | 97.3 | 100 |
| North Carolina | 15.3 | 12.7 | 15.5 | 5.3 | 94.7 | 100 |
| South Carolina | 7.5 | 6.0 | 7.6 | 5.1 | 94.9 | 100 |
| Georgia | 14.8 | 16.7 | 14.7 | 7.2 | 92.9 | 100 |
| Florida | 33.3 | 31.9 | 33.4 | 6.1 | 93.9 | 100 |
| State total | 100 | 100 | 100 | ... | ... | ... |
| East South Central | 5.9 | 4.7 | 6.0 | 5.0 | 95.0 | 100 |
| Kentucky | 24.2 | 30.0 | 23.9 | 6.3 | 93.8 | 100 |
| Tennessee | 33.5 | 33.8 | 33.4 | 5.1 | 94.9 | 100 |
| Alabama | 25.8 | 23.2 | 26.0 | 4.5 | 95.5 | 100 |
| Mississippi | 16.5 | 13.0 | 16.7 | 4.0 | 96.0 | 100 |
| State total | 100 | 100 | 100 | ... | ... | ... |
| West South Central | 11.1 | 8.8 | 11.3 | 5.0 | 95.0 | 100 |
| Arkansas | 8.5 | 6.5 | 8.6 | 3.8 | 96.2 | 100 |
| Louisiana | 13.7 | 11.1 | 13.8 | 4.1 | 95.9 | 100 |
| Oklahoma | 11.0 | 10.0 | 11.1 | 4.5 | 95.5 | 100 |
| Texas | 66.8 | 72.4 | 66.5 | 5.4 | 94.6 | 100 |
| State total | 100 | 100 | 100 | ... | ... | ... |

Table 3. Opt-out choice, by credit characteristic of individuals with credit records and by region and state of residence, June 30, 2003—Continued

Percent

| Item | All | Distribution of opt-out choice, by characteristic | | Distribution of characteristic, by opt-out choice | | |
|---|---|---|---|---|---|---|
| | | Opted out | Did not opt out | Opted out | Did not opt out | Total |
| Mountain | 6.6 | 8.3 | 6.5 | 8.0 | 92.0 | 100 |
| Montana | 4.8 | 4.4 | 4.8 | 7.4 | 92.7 | 100 |
| Idaho | 6.5 | 4.5 | 6.7 | 5.5 | 94.5 | 100 |
| Wyoming | 2.6 | 2.0 | 2.6 | 6.2 | 93.8 | 100 |
| Colorado | 24.8 | 31.4 | 24.2 | 10.1 | 89.9 | 100 |
| New Mexico | 9.1 | 6.4 | 9.3 | 5.6 | 94.4 | 100 |
| Arizona | 27.6 | 31.4 | 27.3 | 9.1 | 91.0 | 100 |
| Utah | 11.9 | 11.1 | 12.0 | 7.4 | 92.6 | 100 |
| Nevada | 12.7 | 8.8 | 13.0 | 5.6 | 94.4 | 100 |
| State total | 100 | 100 | 100 | ... | ... | ... |
| Pacific | 16.7 | 17.5 | 16.6 | 6.7 | 93.4 | 100 |
| Washington | 13.8 | 17.5 | 13.6 | 8.4 | 91.6 | 100 |
| Oregon | 7.9 | 10.7 | 7.7 | 9.0 | 91.0 | 100 |
| California | 74.6 | 68.5 | 75.0 | 6.1 | 93.9 | 100 |
| Alaska | 1.3 | 1.2 | 1.3 | 6.2 | 93.8 | 100 |
| Hawaii | 2.5 | 2.2 | 2.5 | 5.9 | 94.1 | 100 |
| State total | 100 | 100 | 100 | ... | ... | ... |
| Subregion total | 100 | 100 | 100 | ... | ... | ... |

Note. Sample is a nationally representative selection of 301,536 individuals with credit records in the database of a consumer reporting agency as of June 30, 2003.

... Not applicable.

individual lives, and by characteristics of the census tract in which the individual lives (degree of urbanization, income, and race or ethnicity).[18]

Analysis of the sample of credit records indicates that individuals on the opt-out list maintained by the national CRAs exhibit credit and personal profiles that differ noticeably from other individuals in several dimensions, including some measures of credit use and creditworthiness, but not in others. In general, those with greater current credit experience (evidenced by numbers of credit accounts, amounts outstanding, or available as credit lines) and those who are better credit risks are somewhat more likely to opt out. In contrast, those with few credit accounts, smaller outstanding balances, less

[18] Information on the age of individuals who opt out and the characteristics of the census tracts in which they live are found in appendix B.

credit currently available in terms of additional lines, and greater credit risk are somewhat less likely to opt out.

These findings lend themselves to more than one interpretation. One possibility is that those individuals with more credit accounts or exhibiting lower credit risk choose not to receive additional prescreened solicitations because they believe that they have enough credit sources available. At the same time, those with less credit currently in use or exhibiting higher measures of risk may be less interested in cutting off their access to more credit. Alternatively, those with more credit and who are better risks may have reviewed so many prescreened solicitations that they are simply more likely to have observed the opt-out notice and to have acted on it. Of course, these hypotheses are not necessarily incompatible; both may be correct to some degree. Furthermore, only a minority of individuals in any grouping have placed their names on the opt-out lists maintained by the national CRAs (table 3).

## Credit Characteristics of Those Who Opt Out

Factors related to whether a consumer may opt out of receiving prescreened solicitations include the following: number of credit accounts, credit limits and outstanding balances, credit scores, presence of a mortgage, collection items and public records, and creditor and insurer inquiries.

### Number of Credit Accounts

Most individuals with credit records have at least one credit account of some type in good standing, and more than 40 percent of those with credit accounts have four or more such accounts (table 3). Nearly 11 percent of the individuals in the sample with six or more active credit accounts have chosen to opt out of receiving prescreened solicitations, compared with about 3 percent of those with just one active account and only 1 percent of those with no active accounts. A similar pattern is evident with regard to credit card accounts. About 11 percent of the individuals with seven or more credit card accounts have opted out of further prescreened solicitations compared with about 2 percent of those with only one such account and only 1 percent of those with no credit card accounts.

### Credit Limits on Revolving Accounts

The same pattern is again evident when considering the total size of revolving credit lines. The similarity is not surprising because the number of credit card accounts, which constitute the bulk of revolving-credit lines, is correlated with total credit lines. Issuers of credit cards and unsecured personal lines of credit typically restrict the size of the credit line to limit the credit risk posed by any given account. Creditors normally report

the credit limits established for a revolving account when they report account information to CRAs (although not always, particularly in the past). Summing the reported credit limits on each revolving account available to an individual gives an estimate of the aggregate credit limit on accounts of this type for each individual. In those cases in which creditors fail to report the credit limit on the account to the CRA, the typical industry practice is to assume that the highest balance ever reported as owed on the account is the limit, and that approach is employed here.

Sorting the opt-out list according to credit limit on revolving accounts shows that about 13 percent of the individuals in the top quintile of credit-line holders have opted out of receiving additional prescreened solicitations. Only 4 percent of individuals with a total revolving credit line in the bottom quintile have opted out.

### Total Balances and Utilization Rate on Revolving Accounts

Another measure of credit availability and use is the amount actually owed on revolving credit accounts. In this case, the sample of credit records shows that those in the highest quintile of individuals arrayed by balances owed are more likely to opt out of further prescreened solicitations than individuals in the lower quintiles. The ratio of balance outstanding to the total credit limit for each individual permits construction of an overall credit "utilization rate." When evaluating the credit risk posed by a prospective borrower, creditors often consider such a ratio. In this case, the sample data indicate that those individuals with utilization ratios in the middle range are about twice as likely to opt out as those with ratios at the extremes. Individuals with credit utilization rates in the lowest and highest quintiles may desire additional credit opportunities and so they may be less likely to opt out.

### Number of Mortgage Accounts

Credit records also include information on mortgages. The sample data indicate that about one-fourth of the individuals represented had a mortgage loan outstanding. About 11 percent of the individuals with a mortgage in good standing have placed their names on the opt-out list, compared with 5 percent among those who do not have such a mortgage.

### Credit Score

Most individuals have good credit histories, as reflected in the distribution of credit scores across the population of individuals with credit records (table 3 and figure 2). Assuming they satisfy other underwriting requirements, such individuals pose relatively little credit risk to prospective lenders. Creditors vary somewhat in the thresholds they use to identify individuals who pose relatively little credit risk, but in general those with

Figure 2. Distribution of individuals with credit records, by credit score, June 30, 2003




Note. Sample is a nationally representative selection of 301,536 individuals with credit records in the database of a consumer reporting agency as of June 30, 2003.

credit scores above 660 fall in this group and are frequently referred to as prime borrowers. Among individuals assigned credit scores in the Board sample, 73 percent had credit scores above 660.

At the other extreme are individuals who pose relatively high credit risk. Individuals with credit scores below 620 are frequently referred to as nonprime or subprime borrowers. About 17 percent of the individuals in the sample with credit scores had scores of 620 and below. It should be noted that the thresholds used for distinguishing individuals who pose higher or lower credit risk vary not only among creditors but also across credit types. Secured credit products, such as mortgages or vehicle loans, sometimes have different thresholds than unsecured products, such as credit cards.

According to the sample data, the propensity to opt out varies among individuals arrayed by their credit scores. Individuals who opt out tend to have relatively high credit scores; the mean and median credit scores for those in the sample who have opted out were 742 and 765 respectively, compared with 705 and 722 for those who have not opted out (data not shown in tables). Moreover, larger proportions of individuals with higher credit scores have opted out compared with the proportions with lower scores. Nearly

10 percent of individuals with credit scores above 700 have opted out, but only 3 percent of those with credit scores below 550 have done so. In the aggregate, 77 percent of all individuals who have opted out have credit scores above 700, whereas about 60 percent of the entire sample has a credit score in that elevated range. Almost 88 percent of all individuals who have opted out may be considered prime borrowers (credit scores above 660), whereas about 73 percent of all individuals in the sample are in that category.

As noted, not every individual in the Board sample of credit records has a credit score. Of the individuals who were not scored (mostly because of a sparse credit history), only 0.2 percent opted out, compared with 7.6 percent of the scored individuals. The lower incidence of opting out among the individuals without credit scores may simply indicate that these individuals receive and review fewer prescreened solicitations and hence may have fewer opportunities to become aware of the opt-out option. Alternatively, such individuals may be relatively more interested in building their credit records by obtaining new credit and may be less interested in pursuing the opt-out option.

## Number of Collection Items and Public Records

The number of collection items in an individual's credit record is an important indicator of credit risk. More than one-third of the individuals in the sample data had one or more collection items in their credit records; these individuals are somewhat more likely to opt out than individuals with no reported collection actions—7.3 percent versus 5.8 percent.

The number of public records in an individual's credit record is also an important indicator of credit risk. Most individuals in the sample (88 percent) did not have any public-record actions in their credit records. The sample data indicate that individuals with one or more records of a public action are somewhat more likely to opt out than other individuals, but the difference is not particularly large—7.3 percent versus 6.2 percent.

## Number of Recent Inquiries about Credit or Insurance

Finally, credit records contain data on inquiries made about an individual's credit circumstances. The information includes the identities of firms or individuals who request such information (for example, landlords or prospective employers), the date of the inquiry, and an indication of the purpose of the inquiry. Most inquiries arise when an individual is seeking credit and the prospective creditor or insurer contacts a CRA about the individual's current credit status.

Not every use of a credit file results in a lasting record of an inquiry. For example, only inquiries made over the previous two years are included in credit records. In addition, inquiries made in the course of sending prescreened solicitations or to monitor existing account relationships do not appear on the credit report used for prescreening. Also not

appearing on the report used for prescreening are individuals' requests for copies of their own reports.

About 80 percent of the individuals in the sample had a record in their credit file of one or more inquiries over the past year; about 11 percent of the individuals had six or more inquiries. Available evidence suggests that the number of inquiries recorded in an individual's credit record is largely unrelated to propensity to opt out of further prescreened solicitations. For example, 7.9 percent of those who had more than six inquiries recorded in their file over the past year opted out, compared with about 7.4 percent of the individuals with no record of an inquiry over this period.

## Locational Characteristics of Those Who Opt Out

Information in the sample data on place of residence allows examination of the propensity to opt out by region of the country and by state. By region (Northeast, Midwest, South, and West, each also with subregions), the sample data indicate little difference in the propensity to opt out. Individuals residing in the West have the highest incidence of opting out (7 percent), and those residing in the South have the lowest (5.7 percent). Among the subregions, the West North Central and Mountain areas have the highest opt out rate (about 8 percent of the individuals with credit records) and the East South Central and West South Central areas have the lowest rate of opting out (5 percent of the individuals). As with the regions, the states vary in the propensity of individuals to opt out. Residents of Missouri and Colorado have the highest rate of opting out, while residents of West Virginia and Arkansas have the lowest rates.

# Benefits of Receiving Written Offers of Credit or Insurance

The third issue that section 213(e)(3) of the Fact Act asks the Board to address is "the benefits provided to consumers as a result of receiving written offers of credit or insurance."

## GREATER AVAILABILITY OF TARGETED PRICING AND PRODUCT INFORMATION

Prescreened solicitations significantly benefit consumers by providing them with ready access to product information on credit and insurance products for which they likely qualify. Thus, prescreened offers help consumers by greatly reducing the time and effort necessary for shopping for these products. Also, the widespread dissemination of pricing and product information contained in prescreened offers helps to make markets for these products more competitive, a result that benefits all consumers whether or not they engage in extensive shopping themselves.

Theoretical developments in economics known as the *economics of information* have demonstrated the importance of information for the effective and efficient functioning of product markets and for enhancing competition. One of the important insights from this comparatively new branch of economic theory is that advertising can contribute to the competitiveness of markets for consumer products by substituting for substantial amounts of consumer shopping.[19] This is especially true for the advertising of product pricing, but it is also true for the advertising of product quality despite the greater difficulty of establishing credible advertising in that area.[20]

Most consumers probably realize that more shopping would be useful in obtaining the lowest available price for their purchases. But aside from new clothing, automobiles, some appliances, antiques and collectibles, and some other items, additional shopping for most products and services is simply too time consuming and burdensome for many consumers relative to the potential benefit. Under these circumstances, advertising can reduce shopping costs if it brings the relevant information to consumers in a way that is less burdensome to them than looking for it on their own. For straightforward products without extensive quality differentiations, widespread availability of price and product

[19] The classic work of the founding father is George J. Stigler (1961), "The Economics of Information," *Journal of Political Economy,* vol. 69 (June), pp. 213-25.

[20] The relationship of information flows and product quality is treated extensively in Joseph E. Stiglitz (1987), "The Causes and Consequences of the Dependence of Quality on Price," *Journal of Economic Literature,* vol. 25 (March), pp. 1-48.

information can improve the competitiveness of markets to the benefit of all buyers, whether they engage in extensive shopping themselves or not.

Probably few consumer products better illustrate the potential benefits of price and product advertising than credit cards. Credit cards likely are not among the products consumers enjoy shopping for; rather, in most cases, they are probably closer to the other end of this spectrum. But, credit cards are relatively simple products that can be compared fairly easily across brands. They have few major differentiating dimensions and pricing appears to be the information of greatest interest among potential users.[21] These characteristics suggest the usefulness both of price lists and of disclosures for simplifying comparisons, and the Congress has already included provisions in the Truth in Lending Act to provide statutory requirements in each area.[22]

## PRESCREENING AND SHOPPING

Prescreened solicitations based on CRA records provide price and product information to the marketplace in vast quantities tailored and provided directly to consumers who might use the products. Consumers receive billions of tailored prescreened solicitations yearly.

For credit cards, each prescreened solicitation contains pricing information in a tabular form in a type size and format that is easy to read and consistent across providers. In this way, credit card solicitations are much different from the advertising typical for many products, which focuses on brand awareness or on product features other than price. The pricing information in prescreened solicitations is tailored to the risk profile of the consumer receiving the solicitation. If a consumer's profile changes over time for the better, the next set of prescreened offerings should reflect the change through an offering at a lower price. Because of this tailored pricing information, prescreened solicitations for credit cards can supplement, and even take the place of, a large amount of consumer shopping for this product, lowering the potential burden to consumers of this volume of unattractive shopping. This possible reduction in shopping costs, along with the widespread dissemination of pricing and product information contained in prescreened offers, may help to make markets for credit cards more competitive.

---

[21] See Thomas A. Durkin (2002), "Consumers and Credit Disclosures: Credit Cards and Credit Insurance," *Federal Reserve Bulletin*, vol. 88 (April), pp. 201-13.

[22] The Fair Credit and Charge Card Disclosure Act of 1988 amended the Truth in Lending Act to require the Board to semiannually survey credit-card rates and terms at 150 financial institutions, including the 25 largest issuers, and to provide the results to the Congress and the public (see Truth in Lending Act, section 136; and "Survey of Credit Card Plans," www.federalreserve.gov/pubs.shop/survey.htm). The Fair Credit and Charge Card Disclosure Act also required that solicitations mailed to consumers or applications to open a credit card or charge card account provide several disclosures, including the annual percentage rate or rates on the account in a tabular format (see Truth in Lending Act, section 122; and Regulation Z, 12 C.F.R. 226.5a(a)(2)(i) and appendix G).

This theory of a competitive market may help put into perspective the often-cited decline in consumer response to the prescreened solicitations for credit cards: one interpretation is lack of interest among consumers, but another is that as consumers have continued to receive information, markets have become more competitive and consumers are thus less frequently receiving offers that are better than their current arrangements. The latter possibility is hardly bad for consumers. Although one cannot attribute all changes in credit card markets in recent years to the greater availability of information, evidence suggests both that many consumers notice the information and that markets have become more competitive over time.

For insurance, the benefits of prescreened solicitations in providing additional information to consumers and reducing shopping costs are similar to those for credit cards. However, insurance sales typically require an extra step before the benefits can be fully realized. Prescreened solicitations for insurance generally do not contain complete pricing information tailored to a consumer because it is difficult to set the price of insurance solely based on information in CRA files. Specifically, prescreening using CRA files reveals something about the creditworthiness of individuals (maybe because it reveals something about the reliability of the insured), but it does not reveal any information about the property or life to be insured. The insurance company must obtain that information through some sort of further contact with the recipient of a prescreened solicitation before the underlying insurance price can be specified completely. Nonetheless, prescreened solicitations for insurance do provide a point of contact between insurance companies actively trying to expand their business and the potential customers receiving the solicitations.

## Consumer Experience with Prescreened Solicitations

To learn more about consumer awareness, attitudes, and responses to prescreened solicitations, the Board sponsored a nationwide survey in which consumers were asked a series of questions on these topics. About 77 percent of respondents held one or more credit cards when interviewed, and 23 percent held none (table 4). Among those with credit cards, 95 percent had a general-purpose credit card with a revolving feature, such as Discover, MasterCard, Optima, or Visa (data not in table).

The survey showed that the majority of consumers both with and without credit cards had received prescreened solicitations in the mail for credit card accounts in the previous six months, although the proportions who received prescreened solicitations differed somewhat between the groups. More than 96 percent of those with credit cards had received prescreened solicitations for additional or replacement cards in the six months preceding the survey, compared with 81 percent of those with no cards. The numbers of prescreened solicitations received also varied between the groups, but most of the respondents in both groups reported receiving multiple prescreened solicitations per month. More than half of the group already holding cards and more than 30 percent of those without cards reported receiving six or more prescreened solicitations per month

Table 4. Selected experiences of surveyed individuals regarding mail solicitations for credit cards and opting out, by whether the individual has a credit card, 2004

Percent

| Category | Has a credit card | Does not have a credit card |
|---|---|---|
| **All individuals** | **77.0** | **23.0** |
| Received solicitation in past six months | 96.1 | 80.8 |
| Distribution by number received monthly | | |
| 1 or less | 11.8 | 18.9 |
| 2-5 | 36.7 | 50.6 |
| 6 or more | 51.5 | 30.5 |
| Total | 100 | 100 |
| Heard about opt-out law | 20.8 | 16.9 |
| Distribution by action taken | | |
| Opted out | 20.3 | 33.3 |
| Thought about opting out | 38.2 | 13.9 |
| Did not consider opting out | 41.6 | 52.8 |
| Total | 100 | 100 |

Source. University of Michigan Surveys of Consumers, May 2004; sample is a nationally representative selection of 500 respondents.

over the preceding six months. Only a small proportion of either group reported that the number of prescreened solicitations received per month during this period was one or zero.

The survey also asked respondents about opting out of prescreened solicitations. About 21 percent of respondents who have a credit card had heard of the opt-out law, and about 20 percent of that group chose to opt out. Multiplying these proportions yields about 4 percent of respondents with credit cards who said they had placed their names on the opt-out list. Likewise about 17 percent of respondents who do not have a credit card had heard of the opt-out law, and about 33 percent of that small group chose to opt out. Multiplying these proportions yields about 5 percent of respondents without credit cards who said they had opted out. An opt-out rate of 4–5 percent is approximately the same (small) proportion of opt outs indicated by the CRA files. Because the survey found that only about 20 percent of consumers are aware of their right under federal law not to receive prescreened solicitations, it seems that if awareness of this right were higher, more consumers would opt out.

For consumers who are aware of the law, a larger proportion of those with credit cards than those without credit cards (38 percent versus 14 percent) said that they had thought about placing their names on the list but had not yet done so. Although thinking about an action is not the same as undertaking it, this outcome is not inconsistent with the finding

from the CRA reports that those with more credit experience are more likely to be involved in the opt-out process than those with less credit experience.

Consumers in the group who said they had heard of the federal law were asked further how they had heard of the law. Most responses mentioned their information was from television, newspapers, and magazines. Some consumers also mentioned family, acquaintances, and other sources. Less than 10 percent of those with credit cards and aware of the law indicated that they learned about the opt-out possibility from the prescreened solicitation itself (data not in table).

The survey also asked those respondents with general-purpose credit cards who had received prescreened solicitations for more information about their experiences with the mailings they had received.[23] One question asked whether the information contained in the mailings was helpful. About 9 percent of the respondents to this question indicated they did not know, and so it seems probable they did not pay very much attention to the information (table 5). The rest of the respondents were close to evenly divided on whether the information received was helpful (about 40 percent) or not (just under 50 percent). Within the groups, a much higher proportion of the negative responders took the more extreme position that it was very unhelpful, probably indicating an expression of frustration with receiving so much "junk mail." Regardless, the finding that a significant portion of consumers appeared to be generally familiar with the kind of information in the prescreened solicitations is consistent with the view that prevalence of prescreened solicitations is useful in disseminating pricing information and encouraging competitive conditions in markets for credit cards generally, even if only a small minority of recipients actually respond to a given prescreened solicitation program.

For those respondents who said that the information was helpful, a follow-up question asked what specific information was helpful. Nearly 70 percent mentioned interest rates or annual percentage rates (table 5). Some noted information about particular rate features, for example, introductory rates or standard rates. About 35 percent of the respondents specifically mentioned various fees such as annual fees, balance transfer fees, and late fees. All of this again suggests that many consumers seem to know what the prescreened solicitations contain, which is important for price competition to work, even if they do not respond to, or even focus very carefully on, the contents of any given piece of mail that they receive from card issuers.[24]

[23] The survey design did not contemplate asking those without general-purpose credit cards many follow-up questions about their experiences with solicitations because the small sample size of this group in the nationally representative survey would not permit much further breakdown of their experiences.

[24] A follow-up question asked both those who said the information was helpful and those who said it was not how it could be made more helpful. Respondents gave a wide variety of answers, but those already favorably inclined toward the information more often suggested aspects of format and clarity (data not in table). Those unfavorably inclined indicated more often either that they did not know how the information could be improved, or just said fewer mailings should be sent. The latter group just seemed more frustrated with the frequency of "junk mail," likely because they were not looking for any more credit cards.

Table 5. Opinions on helpfulness of information in mail solicitations for credit cards among surveyed individuals and their handling of such solicitations, 2004

| Category | Percent |
|---|---|
| *Helpfulness of information* | |
| Very | 7.2 |
| Somewhat | 35.2 |
| Not very | 17.6 |
| Not at all | 31.3 |
| Do not know | 8.7 |
| *Specific information cited as helpful*[1] | |
| Interest rate | |
| Annual percentage rate | 50.6 |
| Introductory rate | 11.4 |
| Standard rate | 10.1 |
| Balance transfers or cash advances | 6.4 |
| Fixed versus variable | 6.7 |
| Any | 68.5 |
| Fees | |
| Fees, not further specified | 9.0 |
| Annual or membership | 14.2 |
| Balance transfer or transaction | 7.5 |
| Late or penalty | 7.5 |
| Any | 35.4 |
| Other | |
| Credit limits, payment policies, grace periods | 13.3 |
| Benefits, rebates, rewards | 2.6 |
| Security, privacy | * |
| Other[2] | 17.6 |
| Do not know | 3.3 |
| *Handling of solicitations* | |
| Open and glance at them | 34.2 |
| Open and examine them | 10.0 |
| Throw them away without opening | 55.7 |
| Total | 100 |

Note. Individuals who have general-purpose credit cards and received solicitations.

1. Respondents could choose up to two items.

2. Includes "terms and conditions," "pre-approval qualifications," and "services."

* Less than 0.5 percent.

Source. University of Michigan Surveys of Consumers, May 2004; sample is a nationally representative selection of 500 respondents.

Another question asked consumers what they actually *do* most often with the mailings they receive. Responses indicate that the mailings are not solely or always considered "junk mail," even if they are so regarded in many instances. About 55 percent said that they throw them away, but the others said that they open them and that they look at them, although not especially carefully (table 5). The respondents who said that they usually opened the prescreened solicitations were asked whether they looked for any particular information, and if so, what information. Among those who usually opened the prescreened solicitations, about 68 percent provided a variety of answers that mostly concerned pricing (data not in table). The remainder indicated that there was nothing in particular they looked for. Again, while it appears that the strong attitude toward the solicitations as "junk mail" leads most respondents to throw them away unopened, it also appears that nearly half of consumers are clearly aware of the contents of the mailings they receive. In other words, they have direct access to pricing and product information at a time when they can make a decision.[25]

In sum, most consumers receive written offers of credit or insurance, and a significant portion appeared to be at least somewhat familiar with the contents of the mailings, including a minority who were aware of the opt-out notice. Only a relatively small proportion acted on the opt-out information and had their names placed on the opt-out list maintained by the CRAs.

## COMPETITION

One cannot demonstrate conclusively that prescreened solicitations have had an effect on the competitiveness of markets for credit cards, but the available evidence is consistent with this hypothesis. Consider, for example, the uptrend in the volume of credit card prescreened solicitations seeking to attract or retain customers through offers of reduced interest rates and additional credit availability (see figure 1). Importantly for consumers, annual percentage rates on credit card accounts have fallen over the past fifteen years. Data from the Board's reporting series FR2835 indicate that credit card interest rates fell sharply from mid-1991 through early 1994, after being relatively stable for most of the previous twenty years, and they fell again over the period 1998-2003.[26] The decline in rates from mid-1991 is the result of many factors, including the continued advancement of data processing, communications technology, and credit evaluation methods such as credit scoring, and the sharp drop in card issuers' costs of funds during this period. But it also seems likely that competitive factors were important in passing production and financing-cost savings through to customers. In 1990, only 6 percent of credit card

[25] Responses to a further question in the survey revealed that about 9 percent of those with general-purpose credit cards who received solicitations in the past six months had responded to a solicitation from some card issuer during that time period (data not in table).

[26] See Board of Governors of the Federal Reserve System (2004), *The Profitability of Credit Card Operations of Depository Institutions* (June) (www.federalreserve.gov/boarddocs/rptcongress) for discussion of this statistical series and a list of credit card interest rates by year (p. 8, table 2).

Figure 3. Distribution of credit card account balances, by interest rate on account, 1990 and 2002




Source. Information Policy Institute (2003), *The Fair Credit Reporting Act: Access, Efficiency & Opportunity: The Economic Importance of Fair Credit Reauthorization* (Washington: National Chamber Foundation for the IPI), June, p. 30, table 6, www.infopolicy.org/pdf/fcra_report.pdf.

balances were on cards carrying rates of less than 16.5 percent; by 2002, that proportion was more than 70 percent (figure 3).

Furthermore, during the past decade, when prescreening has been most prevalent in the credit card industry, the trade press has reported that large competitors have been active in purchasing any available portfolios of card-related receivables. While on its face this might appear to be an action consistent with a reduction in competition, the portfolios have tended to gravitate toward the most aggressively competitive firms in the industry. Furthermore, these purchases have taken place at a time when there are still hundreds of active market participants, including dozens of large ones.[27]

In the area of insurance, the entry into the marketplace of direct issuers (firms that do not rely on agents) who rely heavily on mailed prescreened solicitations for new business undoubtedly has enhanced competition and provided new opportunities for consumers. To the extent that consumers find this alternative attractive, other market participants must respond in order to maintain competitive viability.

## Consumers Benefit from Cost Savings of Creditors and Insurers

As discussed above, many companies that solicit new credit accounts and insurance policies have found prescreening to be a cost-effective way to identify those potential consumers who are likely prospects for the products they offer and to control certain risks related to offering these products. In a competitive market, cost savings for creditors and insurers translates into lower product prices, a greater range of choices, and wider availability of credit or insurance for consumers, including those traditionally underserved.

Because it lowers the costs of soliciting new customers, prescreening also gives even small companies the ability to make credit and insurance available to consumers over a wider geographic area. Such activities can spur competition in local markets.

[27] The Board's most recent report on the profitability of credit card plans reveals that twenty-two large credit card banks (assets of more than $200 million) together held about 68 percent of bank-type credit card credit outstanding (either directly or securitized) at year end 2003. This ratio does not indicate an especially high concentration when compared with that of many other industries. Return on assets for these specialized institutions is higher than for banks as a whole, but the difference is likely due in part to the undiversified nature of their assets by product line (Board of Governors, *The Profitability of Credit Card Operations of Depository Institutions*).

# Costs of Receiving Written Offers of Credit or Insurance

The fourth issue that section 213(e)(3) of the Fact Act asks the Board to address is "whether consumers incur significant costs or are otherwise adversely affected by the receipt of written offers of credit or insurance."

A review of congressional testimony, examination of available studies, discussion with interested parties including members of the Federal Reserve Board's Consumer Advisory Council, and a review of public comments submitted on the present study indicate that four costs or problem areas for consumers have been identified in regard to prescreened offers of credit or insurance: (1) inconvenience, (2) the potential for identity theft, (3) privacy implications, and (4) debt burden.

## INCONVENIENCE

First, but probably least consequential among the four costs or problem areas, is the inconvenience for some consumers arising from receiving unwanted prescreened solicitations for insurance and credit, especially credit card accounts resulting from marketing campaigns relying on prescreening. As noted above, in 2001-02 unsolicited mailings to consumers of offers of credit cards reached 4 to 5 billion pieces annually. Not at all clear, however, is whether the number of mailings would decline significantly, or the need for consumers to dispose of mailings they do not want would diminish (the major element of the inconvenience), if prescreening were not available.

If prescreening were not allowed, credit card companies and other creditors, as well as insurance companies, might well switch a greater portion of their marketing effort to other sorts of purchased mailing lists that did not involve prescreening. This likely would lose many of the efficiencies of prescreened mailings discussed above and employ greater amounts of less-efficient post-screening. A reduced ability to target solicitations to qualified consumers might well lead to a larger number of mailings and might not be any less inconvenient for consumers now concerned about receiving too much "junk mail."

Nonetheless, the consumer survey asked some questions to find out a bit more about consumers' overall attitudes toward the availability of prescreened solicitation programs. Following questions about voluntarily placing their name on an opt-out list, all respondents (whether or not they had credit cards) were asked for their views concerning government intervention in this area. The questions focused on whether they believed an

opt-out law was a good approach and whether they thought the government should ban prescreened solicitations.[28]

Responses to these questions exhibit a distinct preference among consumers for the presence of an opt-out law, even if most do not personally employ it, but also for the government not to decide whether they opt out. About 80 percent of respondents said it is a good idea that there is a federal law permitting opting out, with the proportion somewhat higher among card holders than others (table 6). But about 65 percent of respondents indicated that they do not prefer that the government prohibit prescreened solicitations, even after a majority indicated they do not open and peruse the prescreened solicitations they receive. Again, this proportion is higher among those with credit cards.

Table 6. Attitudes toward the opt-out law and mail solicitations for credit cards among surveyed individuals, by whether the individual has a credit card, 2004

Percent

| Category | Has a credit card | Does not have a credit card | All |
|---|---|---|---|
| **All individuals** | **77.0** | **23.0** | **100** |
| *Existing federal law requires opt-out option* | | | |
| Good idea | 82.1 | 74.4 | 80.1 |
| Bad idea | 16.7 | 20.6 | 17.7 |
| Do not know | 1.3 | 4.9 | 2.1 |
| Total | 100 | 100 | 100 |
| *Should the government prohibit solicitations?* | | | |
| Yes | 26.9 | 49.1 | 31.8 |
| No | 70.8 | 49.1 | 65.2 |
| Do not know | 2.3 | 1.9 | 2.1 |
| Total | 100 | 100 | 100 |

Source. University of Michigan Surveys of Consumers, May 2004; sample is a nationally representative selection of 500 respondents.

[28] Specifically, the first question asked, "Do you think it is a good idea or a bad idea that there is a federal law that permits you to put your name on a list and then credit card companies cannot send you these offers?" This question was followed immediately by a related question, "Do you think the government should prohibit credit card companies from sending pre-approved offers for credit cards?"

These findings suggest that the inconvenience associated with receiving mailings is, overall, not especially great for consumers, even though they apparently frequently consider the mailings "junk mail." Although credit card holders are most likely to receive prescreened solicitations for additional credit cards, and they are more likely than those without cards to say that an opt-out list is a good idea, they largely do not believe that government should eliminate the availability of such solicitations. Presumably this feeling is associated with the view that information about new products, features, and pricing is something that is worthwhile, even if only occasionally used. Although most consumers appear to prefer the availability of an opt-out list, they also appear to prefer that they decide the opt-out question for themselves rather than have the government ban the solicitations altogether.

## THE POTENTIAL FOR IDENTITY THEFT

Second, and potentially much more consequential regarding the costs of prescreened solicitations, is the issue of identity theft. Theft of individuals' identifying information, including bank account numbers, Social Security numbers, and credit information, and use of the information for fraudulent activities has become a major issue for law enforcement. Crimes of this sort have become prevalent enough and of sufficient concern that identity theft has become the recent focus of legislative activity at both the federal and state levels. Indeed, title I of the Fact Act is "Identity Theft Prevention and Credit History Restoration," and fighting identity theft was one of the motivating factors for passage of the act. In 2004, less than seven months after passage of the Fact Act, the Congress turned again to identity theft with passage of the Identity Theft Penalty Enhancement Act. The latter legislation establishes a new federal crime of "aggravated identity theft" for certain kinds of identity-related criminal activity and specifies penalties.

Although identity theft has become a major public issue and is costly to consumers and the economic system generally, a complete review of its causes, consequences, and prevention is beyond the scope of this study, which involves only unsolicited written offers of credit and insurance. Nonetheless, because some observers connect prescreened offers with the possibility of identity theft, some examination is warranted. Consequently, this section looks at congressional testimony on the subject along with a review of studies done by others, public comments, and findings on the subject from the consumer survey.

### Definition of Identity Theft

The definition of identity theft has varied among observers of financial institutions and others interested in the question. The significance of these variations was evident at a February 2004 one-day conference in Philadelphia on the problem of identity theft, which

devoted one of its five sessions to the question of defining identity theft.[29] Variations in the definition of identity theft result in varying assessments of its frequency and significance.

Discussions at the Philadelphia conference showed that law enforcement agencies usually employ what might be called a broad definition of identity theft. Such a definition encompasses any misconduct in the use of a consumer's identifying information, including the theft or misuse of credit cards or card numbers, but it also includes frauds involving employment, government documents, and telecommunications and utilities. Under a definition of this kind, frauds arising from lost credit cards, inappropriate use of credit cards by relatives, or even the use of cards after a wallet theft or purse snatching could be considered identity theft. For law enforcement agencies, credit card fraud is sometimes associated with a violent robbery but usually not, and the subtleties of a narrower definition of identity theft are not typically necessary for their purposes.

In contrast, financial institutions often use a narrower definition of identity theft that focuses on the acquisition of new credit accounts or the takeover of existing accounts by, for example, making unauthorized changes to the addresses on accounts and applying for new credit cards or personal identification numbers (PINs). Under this narrower definition, traditional payment fraud, such as fraud resulting from lost, stolen, or misused credit cards or card numbers, is not identity theft. Financial institutions prefer this narrower definition because their security forces and procedures employ different fraud-prevention techniques to counteract different types of fraud-related behaviors. For financial institutions and their security officials, preventing "identity theft" under their definition involves controls on procedures when opening new accounts or changing consumer information such as addresses on existing accounts. On the other hand, traditional payment fraud is controlled by other means, such as requiring PINs at automated teller machines or using computer programs to monitor accounts for signs of unusual activity.

Attending to the details of the definition are important because the different definitions produce substantially different estimates of the volume of identity theft. The Consumer Sentinel database developed and maintained by the FTC makes available to law enforcement agencies complaints about fraudulent activities received by the FTC and more than 100 other organizations.[30] Under a broad definition of identity theft, this source suggests that about 42 percent of complaints of fraud posted to the database in 2003 consisted of identity theft. The majority of these involved telephone or utilities fraud, employment fraud, government documents fraud, and other bank fraud. The

---

[29] The February 10, 2004, conference at the Federal Reserve Bank of Philadelphia, entitled "Identity Theft: Where Do We Go From Here?" was sponsored by the Payment Cards Center of the Federal Reserve Bank of Philadelphia and the Gartner Fellows Program; for a summary of the conference, see Julia S. Cheney (2004), "Identity Theft: Where Do We Go From Here?" conference summary, Payment Cards Center, Federal Reserve Bank of Philadelphia (April), www.phil.frb.org/pcc/papers/identitytheft_0404.pdf.

[30] See Federal Trade Commission (2004), *National and State Trends in Fraud & Identity Theft, January-December 2003* (Washington: FTC, January 22).

database characterized about 8 percent of the total of cases received as "new account" credit card fraud.[31] This smaller number is closer to the narrow definition of identity theft used by financial institutions.

Another study released by the FTC contains some estimates of the absolute magnitude of identity theft.[32] Using a nationwide consumer survey, the FTC found that about 1.5 percent of respondents said that they had been victims of new-account and other sorts of identity fraud in the past year. The cases included misuse of identifying information when someone is charged with a crime, for renting an apartment, or when obtaining medical care, and excluded the misuse of credit card numbers on existing accounts. However, the incidence of fraud rose to 4.7 percent of respondents when the previous five years are included. According to the study, 4.7 percent represents about 10 million individuals, not all of them, of course, victims of credit card fraud.[33] Some of them experienced more than one type of identity theft over this period, and the survey results refer to the most serious incident reported.

## Prescreening and Identity Theft

For the purposes of this report, the question is not how much identity theft occurs but rather how much is due to crimes involving prescreened solicitations for new accounts. There is only very limited specific information available about this volume, but it seems that, for a number of reasons, identity theft crimes arising from prescreened solicitations account for only a small amount of identity theft under either a broad or narrow definition of the crime.

First, prescreened solicitations typically do not contain information of a sensitive nature that would be useful to a thief. The primary information that would become available to a thief is the recipient's name and mailing address, along with, of course, the information that the intended recipient is considered creditworthy by someone. The recipient's name and address are available from many sources, including the telephone book, mailing lists, the Internet, and even other mail that might also be stolen, including such mundane items as bills, newspapers, and magazines. In addition, evidence of creditworthiness is less than a striking revelation about most members of the population because most are creditworthy to some degree.[34]

---

[31] Federal Trade Commission, *National and State Trends,* p. 10. Nineteen percent of 42 percent equals about 8 percent.

[32] Federal Trade Commission (2003), *Identity Theft Survey Report* (Washington: FTC, September).

[33] This study separates crimes involving existing credit card accounts from other cases of identity fraud, but it does not specifically identify fraud involving new credit card accounts.

[34] The consumer survey results discussed above suggest that as many as 85 percent of households are sufficiently creditworthy to receive prescreened solicitations for credit cards. Some of the remainder have opted out. As noted earlier, credit scores indicate that more than 73 percent of consumers in the Board sample of credit reports would be regarded prime borrowers in many credit programs.

Second, the fraud control systems of the card issuers work best for situations, such as those related to prescreened solicitations, in which the card issuer already knows a bit about the customer and can use this information to help with verification of responses to the solicitation.[35] If, for example, a thief steals a prescreened solicitation and sends a false response to the card issuer, the incoming returned document still faces a variety of fraud controls, including the requirement that activation of the card be completed with a call from the home telephone. In particular, if the thief requests a change of address to complete the theft, the returned solicitation is automatically directed to fraud control, since it exhibits characteristics that raise concerns. The card issuing firm may still eventually issue the card, but not without further screening that often includes manual checking of the address change request by telephone or other means out of the control of the potential thief.

Such control systems apparently are a large part of the reason why card issuers estimate that only a small portion of credit card fraud arises from prescreened solicitations. There is almost no publicly available information about the volume of losses arising from prescreened solicitations, but information that is available suggests the total is comparatively small. According to a report of an interview with a large card issuer, "prescreening has the lowest incidence rate of application fraud versus other application channels." This issuer told the Information Policy Institute that the fraudulent use of prescreened solicitations "accounts for less than 20 percent of identity theft losses at the company, which in turn constitute only a small fraction of its total fraud losses." According to the issuer, most application fraud involving prescreened offers is committed by "someone familiar to the victim," such as a family member or relative.[36] The Information Policy Institute concludes that limitations on prescreening as a method of new account acquisition likely will increase identity theft because prescreening is now such an important channel for acquiring new accounts, and other acquisition channels are associated with greater amounts of identity theft than prescreened solicitations.[37]

In congressional testimony on June 19, 2003, an executive at Chase Cardmember Services documented the infrequent nature of identity theft associated with prescreened solicitations and some of the reasons for its infrequency.[38] According to Chase, identity theft that "involves the unlawful acquisition and use of another person's information to obtain credit, or the use of that information to create a fictitious identity to establish an account" amounts to only about 3 percent of their fraud cases. Closely related account-takeover fraud amounts to about 1 percent of their fraud cases.[39]

[35] A flow chart of the entire process associated with a prescreened solicitation program appears in Information Policy Institute, *The Fair Credit Reporting Act,* appendix F, pp. 91-93.

[36] Quoted passages are from Information Policy Institute, *The Fair Credit Reporting Act,* p. 61.

[37] Information Policy Institute, *The Fair Credit Reporting Act,* p. 62.

[38] Michael D. Cunningham (2003), "Statement," in *The Fair Credit Reporting Act and Issues Presented by Reauthorization of the Expiring Preemption Provisions,* Hearings before the Committee on Banking, Housing, and Urban Affairs, U.S. Senate, May 20, June 19, and July 10, 29, and 31, Senate Hearing 108-579, 108 Cong. (Washington: Government Printing Office), pp. 99-101.

[39] Cunningham, "Statement," p. 100.

To complete a fraudulent application, a potential thief would also need not only name and address but also certain unique identifiers such as mother's maiden name, Social Security number, and other information such as mortgage payments. According to Chase, the need for personal information is the reason that 40 percent of the small proportion of such cases arises from persons familiar to the victim, often family members or those in positions of trust. For the company, identity theft involving prescreened accounts amounted to 600 out of 75,000 fraud cases in 2002 (less than 1 percent) and out of 17 million active card accounts (less than 0.004 percent). The 600 cases in 2002 were less than 0.04 percent of the 1.6 million new accounts opened by Chase that year through prescreened solicitations.[40]

Although such evidence shows that fraud of this sort exists, it also suggests that the incidence is relatively small because there are means to contain it, and much of the remainder arises from family members or associates, who are difficult to control. It does not seem that the existence of prescreened solicitations is likely to make the identity theft situation noticeably worse. It would be easy enough for someone familiar with the victim's identity information, such as a disgruntled family member or dedicated thief, to apply for credit using a false identity through normal "take one" brochures or Internet channels without waiting for a prescreened mailing, which does not contain much identifying information anyway. As the testimony of Chase pointed out, most identity thieves are not going to take the approach of submitting an application subject to verification of information that is generally not easily available to thieves who are not family members.

Also, the Fact Act contains two provisions dealing with prescreened solicitations that are designed, at least in part, to address identify theft issues. First, if a consumer places an extended fraud alert in his or her file at a CRA, the CRA must exclude the consumer from prescreened lists for five years, unless the consumer requests otherwise. Second, if a consumer places an active-duty military alert in his or her file at a CRA, the CRA must exclude that consumer from prescreened lists for two years, unless the consumer requests otherwise.

## PRIVACY IMPLICATIONS

Third among potential consumer costs associated with prescreening are the privacy implications of prescreened solicitations. Some consumers may be concerned that creditors or insurers may have access to the consumer's financial information held by CRAs before the consumer has indicated an interest in a creditor's or insurer's products. Consumers also may be concerned that once creditors or insurers obtain this financial information, these creditors or insurers may use the information for inappropriate purposes or share the information with other parties. As with inconvenience, however,

[40] Cunningham, "Statement," p. 100.

prescreened solicitations do not appear to raise substantial privacy problems for a number of reasons, and for those especially concerned with privacy, opting out seems easy enough, as discussed previously, and provides an effective means for consumers to act on their concerns.

The Fair Credit Reporting Act itself contains several provisions designed, at least in part, to address privacy concerns related to prescreened solicitations. Most important, under the FCRA, consumers have the right to opt out of receiving prescreened solicitations if they do not want their consumer report information to be used for prescreening purposes. And, under the FCRA, creditors and insurers must inform consumers of this opt-out right in each prescreened solicitation they send out.

For consumers who do not opt out, creditors and insurers have only limited access to information in CRA files at the prescreening phase: (1) the name and address of the consumer, (2) an identifier that is not unique to the consumer and that is used by the person solely for the purpose of verifying the identity of the consumer (such as a partial social security number), and (3) other information about the consumer that does not identify the relationship or experience of the consumer with a particular creditor or other entity. Also, the creditor or insurer would know that each consumer on the list at least meets the credit criteria used to generate the prescreened list but would not receive a consumer's specific credit information, such as a credit score, from the CRA as part of the prescreening process.

Creditors or insurers may use the limited information that they receive from the CRAs (as described above) for the purpose of providing a "firm" offer of credit or insurance to the consumer and verifying information provided by the consumer if the consumer responds to the prescreened solicitation. The creditor or insurer generally may not use that information for other marketing purposes.

Creditors or insurers generally do not share information received from CRAs with parties that are not affiliated with the creditors or insurers. If they shared this information with such nonaffiliated third parties, they would run the risk of becoming a "consumer reporting agency" under the FCRA, and most creditors and insurers do not want to be regulated as CRAs. Also, creditors or insurers may share consumer report information about a consumer received from CRAs with companies that are affiliated with the creditors or insurers, but they may do so only if the creditors or insurers provide the consumer an opportunity to opt out of the sharing and then only if the consumer does not opt out. Again, creditors and insurers provide this opt out before sharing such information to avoid the risk of becoming CRAs.

### Debt Burden

Finally, some observers suggest that prescreening can lead to overburdening of consumers with debt. As with any advertising campaign, the goal of credit solicitation is

to sell more products, and, as with any advertising campaign, there is the chance that it will be successful. A number of pieces of evidence suggest that prescreened solicitations for credit cards or other forms of credit have not caused excessive indebtedness among large segments of the public (although there likely are individuals who have been so affected by prescreened solicitations).

One piece of evidence is that a large element of competition in the credit area in recent years has consisted of attempts by lenders to take borrowers from other lenders rather than to add to debt levels. An example of these attempts is the widespread and important marketing approach of offering balance transfers at low annual percentage rates on credit cards. A switch in credit source brought about by a balance transfer does not, by itself, produce an increase in total indebtedness.

Second, most prescreened solicitations are unproductive, as evidenced by recent response rates of about 0.5 percent for a given campaign (figure 1). Consumer survey results indicate that only about 6 percent of consumers had responded to a solicitation for a new or replacement card in the previous six months, and probably only a fraction of those were in any debt difficulty sufficient to cause payment problems, because in that case such consumers would not likely have received prescreened solicitations. As mentioned previously, low solicitation acceptance rates do not mean that the wide circulation of pricing and product information due to these programs is not useful in promoting competition; but it does cast some doubt on the hypothesis that the solicitations, by themselves, result in widespread overindebtedness. Although some cases of consumer overindebtedness arising from solicitations for new credit accounts undoubtedly occur, it is not clear that the elimination of prescreened solicitations would meaningfully reduce the current incidence of overindebtedness.

Furthermore, the relationship of required debt service and financial obligations to income does not suggest that the burden in these areas has increased in recent years as much as is sometimes believed. The Federal Reserve Board regularly estimates the aggregate consumer debt service ratio and the broader financial obligations ratio. These ratios represent aggregates and do not necessarily indicate the experience of the typical household. Although the trend in the ratios in recent years has been upward, they have fluctuated within only a few percentage points over the past fifteen years and, as of mid-2004 were not at their highest levels.[41] However, a rise in the proportion of households filing for bankruptcy over the same period indicates increasing difficulties among some consumers in managing their debts in the face of changing personal circumstances such as loss of employment.

Finally, results of the present study's survey of consumers reveal that some of the anxiety about overindebtedness appears to arise from consumers' concerns about the

[41] For extended discussion of these ratios and measurements of the burden of debt service and financial obligations, see Karen Dynan, Kathleen Johnson, and Karen Pence (2003), "Recent Changes to a Measure of U.S. Household Debt Service," *Federal Reserve Bulletin*, vol. 89 (October), pp. 417-26.

hypothesized experiences of unknown others rather than from these consumers' actual experiences. To probe this issue, respondents were asked whether written offers of credit caused others to use too much credit. About 85 percent of respondents indicated that it did. In contrast, when asked the same question about themselves, the responses provided a mirror image; only 15 percent of respondents believed that prescreened solicitations had caused them to use too much credit.

# Potential Effects of Further Restrictions on Written Offers of Credit or Insurance

The fifth issue that section 213(e)(3) of the Fact Act asks the Board to address is "whether further restricting the ability of lenders and insurers to provide written offers of credit or insurance to consumers would affect: (i) the cost consumers pay to obtain credit or insurance; (ii) the availability of credit or insurance; (iii) consumers' knowledge about new or alternative products and services; (iv) the ability of lenders or insurers to compete with one another; and (v) the ability to offer credit or insurance products to consumers who have been traditionally underserved."

As discussed in this report, it appears that written offers of credit and insurance sent directly to consumers, often resulting from prescreened solicitation lists using credit records in the files of CRAs, have the potential to increase competition in the market for the relevant consumer financial services. Available evidence suggests that the markets for credit cards and insurance have become more competitive over time, and it seems that prescreened solicitations have contributed to this development.

As noted, the primary benefits of competition consist of lower prices and an increased availability of the product or service in question. As a result, it is reasonable to conclude that further restrictions on the ability of lenders and insurers to provide written offers of credit or insurance to consumers would on balance result in a less competitive marketplace and thus relatively higher prices and reduced availability.

It is difficult to see how further restrictions on the ability of lenders and insurers to provide written offers of credit or insurance to consumers would improve the condition of those individuals or groups of individuals who might have been underserved in the past. More competition would presumably serve the interests of consumers better than less competition. Also, prescreening allows marketing to a larger audience of creditworthy individuals, including those in the low- and moderate-income bracket who have a need for credit but may not otherwise apply due to fear of being turned down.

It also is difficult to see how reducing the amounts of direct, tailored information sent to consumers on the availability and pricing of financial services would improve their "knowledge about new or alternative products and services." In today's marketplace, consumers receive vast amounts of information about the availability of credit and insurance. Those sending the prescreened solicitations must tailor the offerings to the actual conditions of recipients because they must be "firm offers of credit or insurance." Such information is much more likely to reflect actual market conditions than advertisements that have few restraints on the claims made or the characteristics of the underlying arrangements. Without prescreening, consumers would be less certain about whether or not they would qualify for favorable terms on the various credit or insurance

products available in the marketplace and might expend valuable time and effort pursuing products for which they do not qualify.

Moreover, restrictions on sending prescreened solicitations are likely to cause creditors and insurers to use less-efficient techniques to market their services, including additional mailings to prospective customers and to those unqualified for the product or service. The additional mailings would result in higher costs and ultimately higher prices to consumers, greater unease for those sensitive to privacy issues, and potentially more incidences of identity theft.

The fact that approximately 20 million consumers have placed their names on the opt-out lists maintained by the national CRAs suggests that it is not especially difficult to avoid written offers of credit or insurance if so desired. Further, consumer survey responses reveal relatively little support for further government restrictions in this area.

Finally, any further legislative or regulatory changes to the opt-out system should be informed by an evaluation of the effects of several new provisions of the Fact Act. In particular, the Fact Act provides further enhancements to the opt-out notice provisions of the FCRA, including a review of the presentation and placement of the notice in written prescreened solicitations and an extension of the opt-out period from two years to five years. The Congress has also directed the FTC to raise public awareness of opt-out rights.

# Appendix A:
# Section 213(e) of the Fair and Accurate Credit Transactions Act of 2003

(e) ANALYSIS OF FURTHER RESTRICTIONS ON OFFERS OF CREDIT OR INSURANCE.—

(1) IN GENERAL.—The Board shall conduct a study of—

(A) the ability of consumers to avoid receiving written offers of credit or insurance in connection with transactions not initiated by the consumer; and

(B) the potential impact that any further restrictions on providing consumers with such written offers of credit or insurance would have on consumers.

(2) REPORT.—The Board shall submit a report summarizing the results of the study required under paragraph (1) to the Congress not later than 12 months after the date of enactment of this Act, together with such recommendations for legislative or administrative action as the Board may determine to be appropriate.

(3) CONTENT OF REPORT.—The report described in paragraph (2) shall address the following issues:

(A) The current statutory or voluntary mechanisms that are available to a consumer to notify lenders and insurance providers that the consumer does not wish to receive written offers of credit or insurance.

(B) The extent to which consumers are currently utilizing existing statutory and voluntary mechanisms to avoid receiving offers of credit or insurance.

(C) The benefits provided to consumers as a result of receiving written offers of credit or insurance.

(D) Whether consumers incur significant costs or are otherwise adversely affected by the receipt of written offers of credit or insurance.

(E) Whether further restricting the ability of lenders and insurers to provide written offers of credit or insurance to consumers would affect—

(i) the cost consumers pay to obtain credit or insurance;
(ii) the availability of credit or insurance;
(iii) consumers' knowledge about new or alternative products and services;
(iv) the ability of lenders or insurers to compete with one another; and
(v) the ability to offer credit or insurance products to consumers who have been traditionally underserved.

# Appendix B:
# Age and Census Tract Characteristics of Individuals in the Credit Record Sample

## AGE

Credit records include information that can be used to determine the age of the individual. The sample data indicate that older individuals are much more likely to opt out of receiving prescreened mail solicitations for credit or insurance than younger persons. About 10 percent of those age 55 and older have opted out, compared with 3 percent of individuals under the age of 25 (table B.1). Younger individuals may be more likely to need credit in the future and for this reason less inclined to limit the number of credit offers they receive in the mail. It is also likely that younger individuals have received fewer prescreened solicitations and may be less aware of the opt-out option.

## URBAN, SUBURBAN, OR RURAL RESIDENCE

The Bureau of the Census categorizes all areas of the country according to three levels, or degrees, of urbanization: urban, suburban, and rural. (Urban and suburban areas constitute metropolitan areas as defined by the Office of Management and Budget; rural areas constitute nonmetropolitan areas.) The sample data indicate that individuals residing in the suburbs are most likely to opt out, and those in rural areas are least likely to do so.

## RELATIVE INCOME OF CENSUS TRACT

The sample data also include state, county, and census tract indicators for the individuals in the sample. For this analysis each census tract was placed into one of four relative income categories by comparing the median family income of the census tract to the median family income of the broader area in which it is located (incomes were as of the 2000 decennial census).[42] For a census tract in a metropolitan (that is, urban or suburban) area, the comparison is to the median family income of the metropolitan area in which the census tract is located; for each rural census tract, the comparison is to the median family income of the nonmetropolitan portion of its state (table B.1).

Individuals residing in lower-income areas (incomes less than 80 percent of the broader area median) have the lowest incidence of opting out (2.6 percent), while those in the highest-income areas (incomes 120 percent or more of the broader area medians) have the greatest incidence of opting out (9.5 percent). These patterns are consistent with differences in the use of credit by the residents of these areas; residents of higher-income areas, for example, have more credit accounts, on average, than residents of lower-income areas (data not shown in tables). As noted

[42] The four income categories correspond to the income groups used to measure the records of banking institutions in complying with the Community Reinvestment Act.

Table B.1. Opt-out choice, by age of individuals with credit records and census tract characteristic of residence, June 30, 2003

Percent

| Item | All | Distribution of opt-out choice, by characteristic | | Distribution of characteristic, by opt-out choice | | |
|---|---|---|---|---|---|---|
| | | Opted out | Did not opt out | Opted out | Did not opt out | Total |
| *Age (years)* | | | | | | |
| Under 25 | 7.0 | 2.4 | 7.4 | 2.9 | 97.1 | 100 |
| 25–34 | 18.0 | 14.3 | 18.3 | 6.8 | 93.2 | 100 |
| 35–54 | 43.4 | 44.9 | 43.3 | 8.8 | 91.2 | 100 |
| 55–64 | 14.3 | 17.5 | 13.9 | 10.5 | 90.0 | 100 |
| 64 or more | 17.4 | 20.8 | 17.1 | 10.3 | 89.8 | 100 |
| Total | 100 | 100 | 100 | ... | ... | ... |
| *Census tract characteristic* | | | | | | |
| Degree of urbanization | | | | | | |
| Urban | 36.5 | 34.8 | 36.6 | 6.1 | 94.0 | 100 |
| Suburban | 45.0 | 52.4 | 44.5 | 7.4 | 92.6 | 100 |
| Rural | 18.5 | 12.7 | 18.9 | 4.4 | 95.6 | 100 |
| Total | 100 | 100 | 100 | ... | ... | ... |
| Income (percent)[1] | | | | | | |
| Less than 50 | 4.4 | 1.8 | 4.6 | 2.6 | 97.4 | 100 |
| 50–79 | 20.5 | 13.4 | 21.0 | 4.1 | 95.9 | 100 |
| 80–119 | 50.2 | 47.7 | 50.4 | 6.0 | 94.0 | 100 |
| 120 or more | 24.9 | 37.1 | 24.0 | 9.5 | 90.5 | 100 |
| Total | 100 | 100 | 100 | ... | ... | ... |
| Percentage of racial or ethnic minorities in the population | | | | | | |
| Less than 10 | 32.4 | 36.8 | 32.1 | 7.2 | 92.8 | 100 |
| 10–19 | 19.0 | 23.7 | 18.7 | 7.9 | 92.1 | 100 |
| 20–49 | 25.5 | 25.4 | 25.5 | 6.3 | 93.7 | 100 |
| 50–79 | 12.4 | 8.6 | 12.5 | 4.5 | 95.6 | 100 |
| 80 or more | 10.9 | 5.5 | 11.2 | 3.2 | 96.8 | 100 |
| Total | 100 | 100 | 100 | ... | ... | ... |

Note. Sample is a nationally representative selection of 301,536 individuals with credit records in the database of a consumer reporting agency as of June 30, 2003.

1. The median family income of the census tract divided by that of a wider area. For metropolitan-area (that is, urban and suburban) census tracts, the wider area is the metropolitan area of the census tract; for rural census tracts, the wider area is the nonmetropolitan portion of its state.

... Not applicable.

in the main text, individuals with more accounts may not feel the need to receive additional solicitations, or they may be more aware of the opt-out option.

### Racial or Ethnic Composition of Census Tract

Finally, census tracts were categorized according to the racial and ethnic composition of their populations (table B.1). The sample data indicate that individuals residing in areas with a relatively low concentration of racial and ethnic minorities (population less than 10 percent minority) are more than twice as likely to opt out as individuals residing in predominantly minority areas (population at least 80 percent minority). These patterns are consistent with differences in the use of credit. Residents of predominantly nonminority areas, for example, have more credit accounts, on average, than residents of predominantly minority areas (data not shown in tables). Once again, individuals with more accounts may not feel the need to receive additional solicitations, or they may be more aware of the possibility of opting out.