**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CYNTHIA A. DIXON** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **C.A. No. 06-442-T** |
| **CALUSA INVESTMENTS, LLC, d/b/a** | ) | |
| **NEXT DAY LOAN** | ) | |
| **Defendant** | ) | |
| | ) | |

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT**

Plaintiff Cynthia A. Dixon ("Dixon" or "Plaintiff") respectfully submits this Memorandum in opposition to the Defendant Calusa Investments, LLC, d/b/a Next Day Loan's ("Calusa"or "Defendant") Motion to Dismiss Complaint. Dixon contends that Defendant obtained information from her "consumer report" in order to send a mailer advertising mortgage loans, in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA") Specifically, Plaintiff contends that the sending of the mailer, which did not contain a "firm offer of credit," did not constitute a "permissible purpose" for Calusa to access her "consumer report" without her consent. Calusa did not have consent to pull Dixon's credit information. Calusa has moved to dismiss her complaint. It's motion should be denied in it's entirety.

## I. MOTION TO DISMISS STANDARDS

Pursuant to Fed.R.Civ.P. Rule 12(b)(6), a complaint may not be dismissed unless it appears beyond doubt that plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. *See* Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 51 (1st

Cir.1990). The Court must assume the truth of all well-pleaded facts and indulge all reasonable inferences that fit the plaintiff's stated theory of liability. In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 15 (1st Cir.2003), *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

In Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S. Ct. 992 (2002), the Supreme Court reemphasized the extremely liberal pleading standard of the Federal Rules of Civil Procedure, noting that a dismissal of claims is only appropriate in the rarest circumstances:

> Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' [citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)]. If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding. Moreover, claims lacking merit may be dealt with through summary judgment under Rule 56. The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim.

*See also Leatherman v. Tarrant Co. Narcotics Intel. and Coord. Unit*, 507 U.S. 163, 168-169 (1993). Any ambiguities or doubts concerning sufficiency of the claim must be resolved in favor of the pleader. Hishon, 467 U.S. at 73. The standard used in determining whether to grant a motion to dismiss for failure to state a claim is not whether a plaintiff will ultimately prevail, but simply whether the claimant is entitled to offer evidence to support the claims. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

## II. THE FAIR CREDIT REPORTING ACT

The FCRA protects the privacy of "consumer reports," which are defined in 15 U.S.C. §1681a(d). Section 1681b provides that it is only permissible to obtain a "consumer report" on a consumer with the written consent of the consumer or for certain "permissible purposes," such as the extension of credit to, or review or collection of an account of, the consumer, employment

purposes, the underwriting of insurance, or in connection with a business transaction that is initiated by the consumer, or to make a "firm offer of credit." This creates a balance between citizens' rights to keep their information private and permitting the use of the private information for specific, approved reasons. It is not an opening for the wholesale and unrestrained invasion of consumers' privacy rights. "Congress did not intend to allow access to consumer credit information 'for catalogs and sales pitches.'" *Cole*, *supra*, 389 F.3d at 727, quoting *Trans Union Corp.*, 267 F.3d at 1143 (D.C.Cir. 2001); *Murray v. GMAC Mortgage Corp.* , 434 F.3d 948 (7th Cir. 2006). Notably, the requester must certify to the consumer reporting agency that such a "permissible purpose" exists. 15 U.S.C. § 1681b(f).

Exhibits A-C attached to Plaintiff's complaint were sent to Plaintiff based on her "consumer report" being prescreened by Calusa. These mailings contained no specific interest rate percentage, and no specific amount for which Plaintiff was approved. They reference an amount, $265,625.00, but the amount was on a faux check, the flyers do not say that a loan in that amount was guaranteed or offered, and the fine print states that the $265,625.00 was nothing more than an "example." The mailing contained no information about the amount of origination fees and closing costs, the minimum and maximum property value requirements, and the underwriting guidelines. There was no "firm offer" of anything. The mailer actually went beyond not disclosing a "firm offer" and affirmatively negated one, by stating that the interest rate may vary according to credit history and other unnamed factors and linking the APR to origination fees and closing costs which could not be determined until Calusa identified the state in which the recipient resided. It is clear from the four corners of the mailer that Calusa did not make an offer capable of acceptance

## III. CALUSA DID NOT MAKE A FIRM OFFER

### A. THE REQUIREMENTS OF A FIRM OFFER

Calusa's actions were clearly an attempt to circumvent the prohibition against obtaining credit information for the purpose of targeting consumers with mere sales pitches or solicitations. Caselaw holds that:

> "firm offer of credit" as "defined in the FCRA as "any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer." 15 U.S.C. § 1681a(1). Cole v. U.S. Capital, Inc., 389 F.3d 719, 726 (7th Cir.2004). Based on this standard, the facts needed to determine whether the Easterns Flyer contains a "firm offer of credit" are relatively easy to identify. They include the type of credit offered, the terms and conditions of that credit, whether the offer was made with the expectation that Hyde would accept, the extent to which Easterns would and did honor its offer, and whether any portion of the offer of credit was guaranteed.

Hyde v. RDA, Inc., 389 F.Supp.2d 658, 664 (D.Md. 2005). *Cole* held that "the statutory scheme of the FCRA makes clear that a 'firm offer' must have sufficient value for the consumer to justify the absence of the statutory protection of his privacy." *Cole*, 389 F.3d at 726. In order "to determine whether the offer of credit comports with the statutory definition" of a firm offer of credit, the court must consider the amount of credit extended, the rate of interest, the calculation of interest, and the terms of the loan. *Id.* at 727-28. "A court must consider the entire offer and the effect of all the material conditions that comprise the credit product in question." Id. at 728 (emphasis in original).

> it is far from clear from the flyer that the offer of credit will be honored even if the consumer meets the conditions set forth in the offer. The offer initially states that, 'in any event you are guaranteed to receive a credit line of at least three hundred dollars for the purchase of a vehicle, GRSI, Coral Springs, FL....' However, later within the offer, the following language appears: 'Guaranteed approval is neither express nor implied.' Therefore, the language of the flyer itself creates a question of whether the offer of credit

will be honored.

*Cole*, 389 F.3d at 728. In *Murray v. GMAC Mortgage Corp.* , 434 F.3d 948 (7th Cir. 2006), the Seventh Circuit held that in order to determine whether a defendant has made a "firm offer of credit,"a court should only determine "whether the four corners of the offer satisfy the statutory definition (as elaborated in *Cole*), and whether the terms are honored when consumers accept." Id. At 956. *Accord*, *Perry*, 459 F.3d at 824 (absent "the precise rate of credit and other material terms . . . in the solicitation," there is no firm offer of credit). In *Murray v. Sunrise Chevrolet, Inc.*, 441 F.Supp.2d 940, (N.D.Ill. 2006), the court stated that it is not permissible to "access sensitive consumer information as long as they cobbled together some mosaic of communication methods whereby a persistent consumer could learn all the details of the offer: a few details about the credit limit in a mailing, a few more details about interest rate and compounding method by telephone, and information about terms of repayment on a website. [This] fails to satisfy the statute." *Sunrise Chevrolet*, 441 F.Supp. 2d at 946.

**B. CALUSA DID NOT MAKE A FIRM OFFER IN ITS MAILER**

Contrary to Calusa's contentions, the information supplied in its mailer simply cannot meet the requirements of a "firm offer." The only information provided in Calusa's mailer about the terms of the loan that the recipient could ultimately receive is (1) an "example loan" amount; with terms and conditions relating thereto (2) a possible monthly payment amount after refinancing that is based upon a sample loan transaction. *Nothing* in the mailer states that the example loan amount and terms and conditions are promised or guaranteed, or relate to Dixon. The mailer fails to tell the consumer what loan is being offered to the recipient. *Cole* held that the provision of a range of possible terms is not acceptable, as the precise interest rate could not

be determined from a range. *Cole*, 389 F.3d at 728. Here there is no range. There is only an example which negates any commitment by Calusa of a loan on any terms.

Calusa argues that the mailer refers to a loan amount of $265,625. However, that amount is displayed on a faux check that states “NON-NEGOTIABLE. THIS IS NOT A CHECK.” Additionally, the bottom of the mailer states that the $265,625 is actually a hypothetical amount based upon a sample loan amount. In fact, one presumes (although it is not stated anywhere on the mailer) that a quantifiable loan amount to Dixon would be subject to minimum/maximum home value, her income, expenses, and credit history. Clearly, the solicitation did not convey a specific offer to Dixon. Defendant’s ignore these crucial facts in their memorandum.

The mailer only sets forth an example interest rate. Despite the example rate of 7.99%, the mailer does not state that the rate is guaranteed. Rather, the mailer states that the rate “may vary according to your credit history and other factors.” These words amount to nothing more than a disclaimer that one would expect in a mass solicitation or advertisement. There is no effort to tailor the offer to the recipient. It is possible that the consumer could receive a relatively lower interest rate, or a higher rate, which is obvious. The failure of these statements to be an offer, firm or otherwise, arises from Calusa’s failure to enumerate the factors that would affect Dixon’s rate, rendering the example interest rate virtually meaningless.

Likewise, the amount of fees and charges are unknown, and totally undescribed, to the consumer. The mailer states, instead, that “origination fees and closing costs are included in the APR and may vary by state.” Thus, a consumer who receives Calusa’s mailing does not know how much the credit will cost him; thus she “lacks crucial information about the loan’s terms which would have enabled [her] to determine whether the offer had any value for her.” *Sunrise*

*Chevrolet*, 441 F.Supp. 2d at 947. Accordingly, the mailer is nothing more than a solicitation.

The basic information necessary for the comparison of mortgages has been set forth by the Federal Reserve Board on its web site at: http://www.federalreserve.gov/pubs/mortgage/mortb_1.htm The site provides the following advice:

### Obtain All Important Cost Information

Be sure to get information about mortgages from several lenders or brokers. Know how much of a down payment you can afford, and find out all the costs involved in the loan. Knowing just the amount of the **monthly payment or the interest rate is *not* enough**. Ask for information about the same loan amount, loan term, and type of loan so that you can ***compare*** the information. **The following information is important to get from each lender and broker:**

Rates

- Ask each lender and broker for a list of its current mortgage interest rates and whether the rates being quoted are the lowest for that day or week.
- Ask whether the rate is fixed or adjustable. Keep in mind that when interest rates for adjustable-rate loans go up, generally so does the monthly payment.
- If the rate quoted is for an adjustable-rate loan, ask how your rate and loan payment will vary, including whether your loan payment will be reduced when rates go down.
- Ask about the loan's annual percentage rate (APR). The APR takes into account not only the interest rate but also points, broker fees, and certain other credit charges that you may be required to pay, expressed as a yearly rate.

Points

Points are fees paid to the lender or broker for the loan and are often linked to the interest rate; usually the more points you pay, the lower the rate.

- Check your local newspaper for information about rates and points currently being offered.
- Ask for points to be quoted to you as a dollar amount--rather than just as the number of points--so that you will actually know how much you will have to pay.

Fees

A home loan often involves many fees, such as loan origination or underwriting fees, broker fees, and transaction, settlement, and closing costs. Every lender or broker should be able to give

you an estimate of its fees. Many of these fees are negotiable. Some fees are paid when you apply for a loan (such as application and appraisal fees), and others are paid at closing. In some cases, you can borrow the money needed to pay these fees, but doing so will increase your loan amount and total costs. "No cost" loans are sometimes available, but they usually involve higher rates.

- Ask what each fee includes. Several items may be lumped into one fee.
- Ask for an explanation of any fee you do not understand. Some common fees associated with a home loan closing are listed on the Mortgage Shopping Worksheet in this brochure.

Down Payments and Private Mortgage Insurance

Some lenders require 20 percent of the home's purchase price as a down payment. However, many lenders now offer loans that require less than 20 percent down--sometimes as little as 5 percent on conventional loans. If a 20 percent down payment is not made, lenders usually require the home buyer to purchase private mortgage insurance (PMI) to protect the lender in case the home buyer fails to pay. When government-assisted programs such as FHA (Federal Housing Administration), VA (Veterans Administration), or Rural Development Services are available, the down payment requirements may be substantially smaller.

- Ask about the lender's requirements for a down payment, including what you need to do to verify that funds for your down payment are available.
- Ask your lender about special programs it may offer.

If PMI is required for your loan,
- Ask what the total cost of the insurance will be.
- Ask how much your monthly payment will be when including the PMI premium.
- Ask how long you will be required to carry PMI.

(emphasis supplied).

The Federal Reserve Board explains the minimum information necessary for a consumer to be able to compare mortgages. None of this necessary and important information is provided in Calusa's mailer. Therefore, the mailer provides no value to a consumer investigating mortgages. Recognizing these deficiencies, Calusa misrepresents the nature and contents of the mailer. Calusa asserts that the terms were definite and explicit, however, the mailer fails to

contain any concrete terms. Calusa latches on to the terms of the example in the mailer and pretends that these are the terms being offered to the recipient. However, Calusa qualified the “example” loan amount by stating it is an example at the bottom of the mailer.

Under Calusa’s approach, the firm offer of credit requirement may be satisfied by setting forth an example of an offer. A solicitation that does not contain terms does not permit the Court, let alone a consumer, to evaluate the value of the offer and equates to an advertisement in a newspaper or on television. Clearly, Calusa’s mailer, with its disclaimers, is nothing more than a solicitation or advertisement. If Congress intended access to sensitive credit information for basic solicitation purposes, then there was no reason to use the well recognized legal term “offer” in the exception and add the further requirement that the offer be “firm”. If Calusa is correct that a firm offer requires no more than an example, then Congress certainly used the wrong words in the statute. In summation, Calusa used the prescreened credit information to attract prospects to whom it could make sales pitches and further negotiate specific terms of a loan. The “four corners” of the mailing to Plaintiff establish this contention.

The above analysis is consistent with the position of the Board of Governors of the Federal Reserve System. The Board was directed to issue a report to Congress on the “Further Restrictions on Unsolicited Written Offers of Credit and Insurance”.

The December, 2004 report concluded:

> In today’s marketplace, consumers receive vast amounts of information about the availability of credit and insurance. Those sending the prescreened solicitations must tailor the offerings to the actual conditions of the recipients because they must be “firm offers of credit or insurance”. Such information is much more likely to reflect actual market conditions than advertisements that have few restraints on the claims made or the characteristics of the underlying arrangements.

See Report at p. 47.

The question before this Court is what category does the Calusa mailer fall within? Is it tailored to the recipient by the use of an example with numerous disclaimers? Or, ( as Plaintiff contends) is it an advertisement or solicitation making unrestrained claims hiding behind an example? Plaintiff submits that the Calusa mailer is an advertisement and not a tailored offer as required by the FCRA.

### C. THE MAILER DID NOT PROVIDE AN OFFER CAPABLE OF ACCEPTANCE

Calusa claims that its mailer did contain a firm offer of credit because it set forth an offer of an adjustable rate mortgage loan of $265,625 to Dixon . However, the fine print at the bottom of the page states negates any offer since it is states it is nothing more than an example. "The example is based upon the following: A New Calusa arm loan of $265,625 with a term of 360 months (30 years) and an Annual Percentage Rate of 7.99% and an Annual Percentage Rate ("APR") of 10.546%." The back page of the mailer goes on to state that the interest rate will vary according to credit history and other factors, and the APR incorporates origination fees and closing costs that vary by state. Thus, Calusa's argument cannot be reconciled with the FCRA authority cited herein, and actually reads the term "offer" out of the statute and certainly disclaims that it is "firm".

The FCRA defines "firm offer" in terms of an offer than meets certain requirements. *Cole*, 389 F.3d at 727-28. Offer is not defined. When terms with a common legal meaning are used in a statute and not defined, the common meaning prevails. *FDIC v. Meyer*, 510 U.S. 471,

476 (1994) ("in the absence of... a definition, we construe a statutory term in accordance with its ordinary or natural meaning"). Black's Law Dictionary defines "offer" as a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it . . . . The offer creates a power of acceptance permitting the offeree by accepting the offer to transform the offeror's promise into a contractual obligation." BLACKS LAW DICTIONARY 1081 (6th ed. 1990).

In general, in order for there to be an offer, there must be something that is capable of acceptance. The following excerpts from the *Second Restatement of Contracts* are instructive:

> An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and *will conclude it*.
>
> ...the key concept involves giving the addressee the apparent power to conclude a contract *without further action by the other party*...
>
> A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain *until he has made a further manifestation of assent*.
>
> Business enterprises commonly secure general publicity for the goods or services they supply or purchase. Advertisements of goods by display, sign, handbill, newspaper, radio or television are not ordinarily intended or understood as offers to sell. The same is true of catalogues, price lists and circulars, even though the terms of suggested bargains may be stated in some detail. It is of course possible to make an offer by an advertisement directed to the general public, but *there must ordinarily be some language of commitment or some invitation to take action without further communication.*

*Restatement (2d) of Contracts,* §§24, 24 reptr. cmt. a, 26, and 26 cmt. b (1981) (emphasis added); see *Black's Law Dictionary* 1081 (6th ed. 1990) (same definition as §24). See also *Boomer v. AT&T Corp*., 309 F.3d 404, 414-415 (7th Cir. 2002) (citing §24); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Albany County*, 369 F.3d 91, 95 (2d Cir. 2004)

(same); *Dean Foods Co. v. Brancel*, 187 F.3d 609, 617-618 (7th Cir. 1999) (citing §26); and *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001) (same).[1]

Further, the Restatement 2d, Contracts, §33, states:

> § 33 Certainty
> (1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.
> (2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
> (3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

"The minimum elements necessary to establish a contract to lend money are the amount, the interest rate, the duration of the loan and the method of repayment" *Read v. McKeague*, 252 Mass. 162, 147 N.E. 585 (Mass. 1925); Thall v. Berkowitz, 265 Mass. 335, 163 N.E. 876 (Mass. 1928); *Geo. W. Wilcox, Inc. v. Shell Eastern Petroleum Products, Inc.*, 283 Mass. 383, 390, 186 N.E. 562 (Mass. 1933);; *Stansel v. American Security Bank*, 547 A.2d 990, 993 (D.C. App. 1988)

---

[1] *Cole v. U.S. Capital, Inc.*, 389 F.3d 719 (7th Cir. 2004) held that "offer" is undefined within the "firm offer of credit" definition, and that the term's meaning was a question of legislative intent. *Cole* found that Congress intended the term "firm offer of credit" to have a uniform meaning from state to state. *Cole*, 389 F.3d at 726 n.6. Thus, plaintiff relies upon the definition used in the *Second Restatement* (which has been relied upon by the Seventh Circuit) and in *Black's Law Dictionary*; given the fact that this represents the commonly accepted definition of "offer," plaintiff believes that it can be used in order to determine what Congress meant by the term.

(amount of loan, interest rate, terms of payment, manner of performance); *McClellan v. Banc Midwest, McLean County*, 164 Ill.App.3d 304, 517 N.E.2d 762, 765 (1987) ("intended duration of the line of credit; the applicable rate of interest . . .or the basis for how such interest would be ascertained; what duration or date or dates were contemplated for maturity of such loans; and what mode or rate of repayment was contemplated"); *Central Production Credit Ass'n v. Reed*, 805 S.W.2d 300, 302 (Mo. App. 1991) (amount, manner of repayment or due date, security, and rate of interest required); *Malaker Corp., etc. v. First Jersey Nat'l Bank*, 163 N.J.Super. 463, 395 A.2d 222, 227 (App. Div. 1978) ("what rate of interest the loan would bear, what were to be the terms of repayment of such loans, whether they were to be repaid on demand or were to be given on time notes, whether they would be collateralized and, if so, what collateral").

An "offer" for a loan that does not identify the precise amount and interest rate in writing is an uncertain non-offer, which cannot be accepted. *Cole*, 389 F.3d at 728 (noting that an "offer" for a loan, which states a range of interest rates, from 3.0 to 24.9 percent, fails to meet the definition of an offer). A consumer cannot evaluate whether an "offer" has value if the offer fails to specify key terms in writing. *Id*. No offer was made to Cynthia Dixon.

## IV. CALUSA IGNORES RELEVANT CASELAW

Recognizing that there is no binding precedent in the First Circuit, rather than seriously address the *Cole* and *GMAC Mortgage* decisions which are on precisely on point and support Plaintiff's position, Calusa attempts to muddy the waters by citing to a variety of factually distinct decisions.

In Poehl v. Countrywide Home Loans Inc.,,No. 4:06CV928 ( E.D. Mo. November 1,

2006), the plaintiff's solicitation specifically stated "you've been pre-selected for $92,500 from Homeowners Loan Corp." Though the Court disagreed with *Cole*'s requirement that a precise interest rate and term of loan are required to be disclosed to the consumer in the solicitation, the *Poehl* Court nevertheless recognized that a precise loan amount was being offered to the consumer which satisfied the requirements of the FCRA. In this case no concrete definite loan amount was offered to Dixon. Thus, even applying the analysis of *Poehl* this Court should conclude that the offer was not firm and therefore deny the motion to dismiss. 2

Moreover the *Poehl* Court in Klutho v. Home Loan Ctr., Inc., 2006 U.S. Dist. Lexis 79759, 11-15 (D. Mo. 2006) held "[w]hen the mailing is evaluated objectively and its entirety, it provides no basis for a consumer to regard it as an offer having any value, and there is nothing to distinguish it from any other unsolicited advertisement. Since Home Loan Center allegedly accessed Klutho's credit report to get the information it needed to send him the mailing, he has stated a claim for a violation of his rights under the Fair Credit Reporting Act.". The Court denied the Defendant's motion to dismiss based on a solicitation similar to the one before this Court.

In Bonner v. CorTrust Bank, 2006 WL 1980183 (N.D.Ind. 2006), the Court found that the bank's offer specifically extended "an initial line of credit of $250. In addition, the Terms and Conditions insert clearly explains the interest rate, the method for compounding interest, and the repayment period." Id. at page 6. Once again, no such concrete disclosures were contained

2 Moreover, given the information identified by the Federal Reserve Board, supra, as necessary for a consumer to compare mortgages, Plaintiff respectfully submits that the *Poehl* Court's minimal criteria is insufficient since it requires far less than the minimal information determined to be necessary to compare mortgages. Without all of the information necessary to compare, the

in the solicitation sent to Dixon. In Gamble v. CitiFinancial, 2002 WL 31643028, the pro-se plaintiff received a "Special Notice" which stated that "Our central office has authorized me to offer you a pre-approved loan for $5,500." The reverse side sets out the "Terms of Pre-Approved Offer" in smaller print, stating that "The credit may not be extended, if, after you respond to the offer, we determine that you do not meet the criteria used to select your name for this offer, or any applicable criteria bearing on creditworthiness, or you have opened any loan account with us in the last 75 days." The Court granted CitiFianancial's motion to dismiss on the grounds that a firm offer to loan the sum of $5,500 had been extended. Ironically, since no specific offer of any kind was extended to Dixon, the holding in *Gamble3* supports Dixon's claim.

In Putkowski v. Irwin Home Equity Corp., 423 F. Supp. 2d 1053 (N.D. Cal. 2006), which is on appeal to the 9th Circuit, once again the offer contained a minimum $15,000 20-year line of credit up to $300,000 with a maximum interest rate of 24%. The District Court held that the "fact that a recipient might later receive a more favorable offer of credit does not violate the FCRA." Likewise, in Soroka v. Homeowners Loan Corp., 2006 U.S. LEXIS 38847 ( M.D. Fla. June 2006) the Defendant offered a loan of $55,000 without articulating the other terms. No such

---

information is not a tailored offer required by the FCRA.

3 The Defendant's citation to Forrest v. Universal Savings BankF.A., 2006 WL 3486913 ( E.D. Wis. Dec 1.2006) as so called "supplemental authority" is equally unavailing. In this credit card case, the consumer received a letter which stated that " Forrest is eligible for a credit line of up to $15,000, no annual fee and 10.99% variable APR". No such information was conveyed to Dixon in her solicitation.

minimum loan amount was offered to Dixon, therefore *Putkowski* and *Soroka* are clearly distinguishable.

Calusa also relies upon Murray v. HSBC Auto Finance, Inc., 05 C 4040, 2006 U.S. Dist. LEXIS 74128 (N.D. Ill. Sept. 27, 2006) (notice of appeal filed October 2, 2006). In that case, the HSBC mailer contained an interest rate reduction percentage of 5.04%. The Court found that this percentage represented the "average interest rate reduction obtained by all consumers who refinanced their loans with HSBC before the company launched this solicitation campaign." (*HSBC*, *supra*, at * 3-4). While not specifically based on the recipient's credit information, the Court found that such a figure at least provided the recipient with some idea of what the average consumer saved. Calusa's mailer to Dixon provides an example rate of 7.99%, but it has not presented any evidence indicating that this rate is the highest rate, lowest rate, or an average rate offered to its recipients. Thus, this interest rate is purely speculative. In marked contrast to the Calusa mailer, the HSBC mailer did not later disclaim that interest rate by stating that it could vary according to your credit history and other factors.

The hypothetical example proffered by Calusa is essentially useless, as the consumer has no indication how Calusa determined the terms in the example. From the mailer, the consumer has no way of knowing whether she would be offered similar terms, or if she would even meet Calusa's initial valuation requirements. It is possible that no one received terms along the lines of the hypothetical described in the mailer. The amount of the loan, the interest rate, APR, fees and other charges, cannot be compared to: (a) the cost of the current loan owed by the consumer, or (b) the cost of other loans on the market, based upon what is in the mailer. In fact, Plaintiff can not evaluate whether she would even meet Calusa's basic requirements for a loan because

she does not know the minimum and maximum property value requirements. The terms could only be learned upon further inquiries by the recipient of the mailer. In light of all of this, and based upon the content of the mailer itself, "the [mailer] provides no more information than does a mailer soliciting loan business by requesting consumers to call a toll-free number or visit a website, [and thus] does not provide 'sufficient value' to the consumer to justify access to her credit information." *Sunrise Chevrolet*, 441 F.Supp. 2d at 947. See *Murray*, 2006 U.S. Dist. LEXIS 15850, *7-*9 (N.D.Ill. Apr. 4, 2006); *Kudlicki*, 2006 U.S. Dist. LEXIS 20302, *2-*6 (N.D.Ill. Jan. 20, 2006).

Furthermore, the mailer is deceptive. It states that "although a debt consolidation loan may lower your monthly payments, it may increase the number of monthly payment and increase the amount paid over the term of the loan. The monthly payment savings matrix in the mailer is merely bait to entice applications. According to Calusa, the hypothetical payment reduction is based upon an example "arm loan" which does not guarantee the terms to Plaintiff.

Calusa did not make an offer, but only provided a solicitation that could lead to the presentation of an offer at some future date. *Hernandez v. Chase Bank*, 429 F.Supp. 2d 983, 988 (N.D.Ill. 2006). Specifically, Calusa provides virtually no useful information, though it had a "matrix of loan terms" that could have been described. Even a range of possible terms is not acceptable under *Cole*, which held that the precise interest rate could not be determined from a range. *Cole*, 389 F.3d at 728. Calusa failed to provide even that much information to consumers.

Clearly, Calusa did not make an offer capable of acceptance, or capable of being compared to other competing products. It does not offer a specific interest rate or APR (or state

how it is to be calculated), or provide other information—including, in this particular case, property value or minimum/maximum loan value requirements. This would allow the consumer to examine the terms, compare them to terms proposed by other lenders, and make an informed decision about whether to pursue the opportunity further. Accordingly, Calusa's mailer fails to provide a "firm offer of credit."

## V. WHETHER OR NOT THE DEFEDNANT ACTED WILLFULLY CANNOT BE DECIDED ON A MOTION TO DISMISS

Calusa argues that it cannot be held to have willfully violated the FCRA. Willfulness under 15 U.S.C. § 1681n has been defined as: To be found in willful noncompliance, a defendant must have "knowingly and intentionally committed an act in conscious disregard for the rights of others. *Stevenson v. TRW, Inc.*, 987 F.2d 288, 293 (5th Cir. 1993). A showing of malice or evil motive is not required to prove willfulness under the Act. *Dalton v. Capital Associated Indus.*, 257 F.3d 409, 418 (4th Cir. 2001).

One factor as to the issue of willfulness recognized by the Dalton Court is whether there have been other complaints against the Defendant. This Defendant was sued for violations similar to the ones alleged herein several months before sending the flyers to the Plaintiff. See *Walker v. Calusa Investments, LLC*, Case No. 06-00508 LJM-WTL (S.D. In.), which was filed in March, 2006.

Plaintiffs submit that they have satisfied the notice pleading requirements of Rule 8. "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims". *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (U.S. 2002). Accordingly, the Defendant's

Motion to Dismiss on this ground should also be denied.

## VI. CONCLUSION

For the reasons stated above, this Court should deny Calusa's Motion to Dismiss.

Respectfully submitted;

/s/Christopher M. Lefebvre #4019
CLAUDE F. LEFEBVRE AND
CHRISTOPHER M. LEFEBVRE, P.C.
Two Dexter Street
P.O. Box 479 (Mailing address)
Pawtucket, RI 02862
(401) 728-6060
(401) 728-6534 (fax)
lefeblaw@aol.com

**Of Counsel:**
Scott C. Borison
Bar No. 22576
Legg Law Firm, LLC
5500 Buckeystown Pike
Frederick MD 21703
Borison@legglaw.com
(301) 620-1010
(301) 620-1018 Fax

**CERTIFICATION OF SERVICE**

I hereby certify that I filed the attached Memorandum in support of Objection to Motion to Dismiss with the Clerk of the District of Rhode Island using the CM/ECF System. The following participants have received a copy and notice electronically: Steven E. Snow at Partridge Snow & Hahn LLP and Bruce Allensworth, Brian M. Forbes and Irene C. Friedel at Kirkpatrick & Lockhart Nicholson Graham LLP on January 05, 2007.

/s/Christopher M. Lefebvre

S:\WPFILES\Fair Credit Reporting Cases\FCRA Class Actions\Dixon v. Calusa Investments\Memo in Oppo to Motion to Dismiss.wpd